**AmSOUTH BANCORPORATION AND SUBSIDIARIES, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. CV86–PT–1690–S.**

United States District Court, N.D. Alabama, S.D.

Feb. 25, 1988.

Alfred F. Smith, Jr., N. Lee Cooper, Maynard Cooper Frierson & Gale, Birmingham, Ala., for plaintiff.

John J. Gill, III, Henry C. Ruempler and Joanne Ames, Washington, D.C., for American Bankers Ass'n., amicus curiae.

Frank W. Donaldson, U.S. Atty., Richard E. O'Neal, Asst. U.S. Atty., Birmingham, Ala., Curtis Bowman, Richard F. Mitchell, William A. Roberts, Trial Attys., Tax Div., Dept. of Justice, Washington, D.C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PROPST, District Judge.

This cause came on to be heard at a bench trial which concluded on October 22, 1987.

## THE ISSUE

Can a bank which acquires the assets and assumes the liabilities of another going concern bank assign some or all of the price paid in excess of tangible values purchased, to an intangible asset known as "customer deposit base" and capitalize, amortize and deduct the same pursuant to Section 167(a) of the Internal Revenue Code and Treasury Regulation § 1.167(a)?

## FINDINGS OF FACT [1]

### The Players

AmSouth Bancorporation and Subsidiaries (hereinafter collectively referred to as AmSouth) is a national banking organiza-

---

**1.** The parties have highlighted portions of duplicate copies of exhibits which they wish to emphasize (plaintiff, yellow; defendant, blue; and a synthesis green). The parties proposed findings of fact which the court considered, revised and expanded upon. The court kept copious notes but has not reviewed a transcript. It has reviewed the exhibits. Some evidence may be slightly garbled on immaterial points. The parties should feel free to suggest substantive changes.

tion, organized and existing under the laws of the State of Delaware, with its principal place of business in Birmingham, Alabama. In February 1979, AmSouth, then named Alabama Bancorporation, acquired the assets and assumed the liabilities of the Bank of East Alabama (BEA), a state-chartered bank located in Opelika, Lee County, Alabama. AmSouth's total cash payment was $4.8 million. A newly formed corporation continued to operate under the BEA name until 1983 when its name was changed to AmSouth.[2]

At the time AmSouth purchased BEA, BEA was one of eight banking institutions in Lee County, Alabama. BEA had more assets than any of the other banks. Lee County was considered to be an attractive, second-tier banking market. Prior to the acquisition of BEA, AmSouth had no operations in Lee County.

### The Tax Returns

AmSouth timely filed federal corporate tax returns for 1978, 1979, and 1980 with the Internal Revenue Service (IRS). The returns reflected depreciation deductions taken by AmSouth, purportedly pursuant to Section 167(a) of the Internal Revenue Code toward the value of the "customer deposit base" AmSouth acquired from BEA. The core deposits of a bank are generally considered in the banking industry to include the demand (checking) and savings accounts of customers and certificates of deposit of less than $100,000.00. The "customer deposit base" is a value assigned to such deposits.[3]

The IRS rejected AmSouth's depreciation deductions and assessed deficiencies against AmSouth. AmSouth timely paid in full the alleged deficiencies. On December 23, 1985, AmSouth filed with the IRS Regional Service Center in Atlanta, Georgia, claims for refunds for the years 1978, 1979, and 1980 on Forms 1120–X. AmSouth requested refunds of $81,320.00 and $92,938.00 for 1978 and 1979, respectively, with no refund due for 1980 due to the carryback of excess credits reflected in the 1978 return. The IRS never acted on AmSouth's refund request, and this lawsuit followed.

### BEA's History Prior To The Sale

BEA was the oldest and a well-established bank in Opelika, Lee County, Alabama which began experiencing difficulties because of bad loans and questionable investments made during the early 1970s.[4] These difficulties resulted from the well-publicized, illegal activities of its president since 1969 and Opelika Mayor, Robert McCullough. McCullough resigned as president of BEA effective January 1, 1977 and was imprisoned for a time as a result of these activities. From about 1976 until the time of the AmSouth acquisition, BEA suffered substantial loan losses, many of the loans having been made on the authority of McCullough.

On June 16, 1976, after Opelika National Bank had applied to convert to a state chartered bank, the State Superintendent of Banks required, as a condition of approval, *inter alia,* that the bank increase its capital by one million dollars of which at least $500,000.00 was to be in new common stock. Although the capital increase was

---

2. The purchase transaction was actually accomplished via the establishment of a new corporation which acquired the assets, assumed the liabilities and made the cash payment to BEA from funds supplied by its stockholder (AmSouth). BEA was thereafter dissolved and the proceeds distributed to its stockholders on a per share basis. This method of handling the transaction, as opposed to AmSouth making a direct purchase, is apparently not deemed by the parties to be significant to the court's consideration. At various times, the court will use the term "plaintiff" and/or AmSouth to refer to the taxpayer and/or the acquiring corporation and its successors.

3. In some instances in briefs, the parties have interchangeably referred to "core deposits," "core deposit base," "customer deposit base" and "customer deposit intangible." As the court understands the concept, "core deposits" are the gross or total deposits in a certain category. When the term "base" is added, it refers to the assigned value which is allegedly depreciable.

4. BEA was formerly known as Opelika National Bank. It was converted to a state chartered bank in late 1976. Some references herein to BEA are actually to Opelika National Bank. The difference is not substantive.

stated to be a condition of approval, the bank was given until 90 days *after* date of conversion to comply. The Superintendent further required, as a condition of approval, that no dividends be paid without the consent of the Superintendent. The Superintendent required that the directors of the bank adopt a resolution "assuring compliance with these conditions," and stated that "we will then issue a Certificate of Approval and a Permit to Transact Business as a state chartered bank." The bank resolved to comply. Thereafter the charter, etc. was issued in September 1976.

On February 1, 1977, the FDIC approved a request of the bank that it be allowed to acquire 1,404 shares of its stock at $850.00 per share as treasury stock,[5] subject to the condition that the bank's total capital be increased by one million dollars.[6]

The capital-to-asset ratio for BEA was 5.5 percent in 1972, 5.7 percent in 1973, 5.9 percent in 1974, 6.1 percent in 1975, 6.6 percent in 1976, 7.5 percent when plaintiff evaluated BEA in mid-autumn of 1977, and 8.0 percent by the end of 1977.[7] The national average capital-to-asset ratio for commercial banks in 1960 was 8.1 percent, 6.6 percent in 1970 and 5.8 percent in 1980.[8] BEA's ratio of loans to deposits had reached an unacceptably high level of 89 percent in 1976 but had been reduced to 80 percent at the time BEA approached plaintiff in 1977. BEA paid a dividend to its shareholders in each year applicable to this case. Earnings per share rose from $.16 in 1976 to $3.84 in 1977.[9] The Bank's market share and deposit *growth rate* declined during the three or four years before the acquisition. This could have been partially explained by an increased number of banks in the county and developing bank holding company influence.

There is some room for dispute as to why BEA's Board of Directors ultimately determined "to sell" the bank. The decision ultimately was influenced by concern about the bank's loan portfolio, the need to raise capital, a possible deterioration of stock values, etc.[10] There is no reason for the court to speculate on whether the bank could have raised the necessary additional

---

**5.** From stockholders dissenting from the conversion to a state bank. This was before a two for one stock split.

**6.** AmSouth has proposed as a fact that these increases were ordered or required by the Superintendent and FDIC rather than being stated as conditions to the indicated approvals. The defendant has suggested that the capital infusion was only a condition of paying a dividend. Both representations are wrong and perhaps misleading. Neither the FDIC nor the State required, "out of the blue," an increase in capital. The FDIC required it as a condition of a treasury stock purchase, the State as a post approval condition of the conversion from a national to a state bank. In any event, the bank never raised the one million dollars in additional capital. The December 13, 1977 bank minutes indicate that oral approval was given to pay "the customary $1.00 dividend" to shareholders as of December 13, 1977. In March 1977, the State directed BEA to comply with the capital condition within 120 days, but did not follow through in any way prior to the acquisition by plaintiff. Plaintiff's exhibit 38 dated October 26, 1977 suggests that at least a partial reason was an improvement in the capital to asset ratio from 6.1% to 7.6% with an anticipated 8%. This was before the Gregory line (see *infra*) was written off. The requirement was apparently suspended as a result of some improvement in conditions in 1977 plus the prospect for infu-

sion of capital through a sale. Neither FDIC nor the State ever enforced the requirements.

**7.** One measurement of a bank's financial condition is its capital-to-asset ratio (the higher the percentage the better). BEA's ratios would have been substantially lower for 1976 and 1977 if the Gregory loans had been written off earlier. A loss of aproximately $1.2 million was charged off on these loans in 1978.

**8.** At this point, FDIC apparently recognized the need for some corrective action, either in form or substance. For a period of time, FDIC specifically opposed the concept of including intangibles such as customer deposit base in determining equity capital. Even today FDIC requires a more rapid amortization of core deposit values than goodwill and continues to deduct core deposit values when determining capital adequacy. FDIC's lead on these matters is usually followed by the Comptroller of the Currency and SEC.

**9.** Again, misleading because the Gregory loans were not written off until 1978.

**10.** Plaintiff attempts to translate the Board's concerns about selling stock to the public because of required disclosures as to loan write-offs and resulting earnings decreases into a loss of goodwill. This argument does not wash.

capital if the attempt had been made. Although there was some desire on the part of the bank's Board to remain independent and some indication of support among directors for raising additional capital, that was not the route taken. A capital deficiency was the bank's main problem.[11]

### The Negotiations

In August of 1977, the Chairman of the Board of First Alabama Bankshares (First Alabama) approached BEA about its purchasing BEA. Thomas Botsford, acting President of BEA, later contacted the plaintiff. Over the summer and fall of 1977, negotiations ensued with both bank holding companies. These potential purchasers were aware of BEA's financial condition when making their offers.[12] In November of 1977, First Alabama made its final offer of $45 (plus an additional reserve amount conditioned on future loan losses). A $45 price represented 1.5 times book value. The BEA Board rejected First Alabama's final offer.[13]

BEA's Board of Directors decided to solicit a purchase offer from AmSouth. The plaintiff's internal analysis of BEA projected a stock price in the $50 to $60 range. The plaintiff, in valuing BEA, paid particular attention to return on assets. The analysis that Dorothy Thomas prepared for plaintiff's Chairman John Woods projected a return on assets of 0.76 percent in order to cover a purchase price of $60 per share.[14] The first nine months of the 1977 return on assets for BEA was 0.79 percent. The Thomas analysis projected the return on assets to rise to 0.87 percent in 1978 and 0.97 percent in 1979. Plaintiff's own return on assets for 1977 was 0.95 percent. In view of this analysis, the plaintiff's Board of Directors authorized negotiations in the mid–$50 range, or about 1.63 times book value.[15]

Plaintiff's first offer, after reviewing BEA's books, was $55 per share. BEA's board rejected this offer. On November 25, 1977, John Woods met with Mr. Botsford, and raised plaintiff's offer to $57 per share. Mr. Botsford informed Mr. Woods that the price was probably insufficient. In a telephone conversation shortly thereafter, Mr. Botsford informed Mr. Woods of BEA Board's decision to reject the $57 per share offer. Mr. Woods then increased plaintiff's offer to $60 per share.

BEA's Board of Directors agreed to the $60 per share price and recommended this offer to its shareholders. The Board of BEA accepted.[16] This price, $60 per share, was 1.875 times book value. On December 30, 1977, as a result of negotiations between the parties, the plaintiff and BEA announced that plaintiff would acquire BEA, for a price of $60 per BEA share, subject to shareholder and regulatory approval and certain examinations of BEA. At that time, there were 80,000 shares of BEA stock outstanding.[17]

11. It is clear that the BEA directors valued their bank as a going concern with a dollar price per share based upon usual going concern bank values. The only negative considerations were the loans and the question of attempting to raise additional capital.

12. First Alabama's original offer was $33.75 per share with an additional $11.25 per share to be held in a reserve escrow subject to loan values.

13. The previous sale of BEA stock had been at a price of $40 per share. When BEA converted to a State bank in 1976, it paid dissenting stockholders at the 1978 rate of $42.50 per share.

14. The analysis gives little, if any, consideration to customer deposit base; certainly no evaluation on this basis. There is a reference to "Core-time Deposits," which, interestingly, does not include demand deposits.

15. Plaintiffs' November 1, 1977 Executive Committee of the Board minutes state, inter alia, that "[t]he loan portfolio appears to be the bank's prime problem." Further that "this possible acquisition would be a higher risk than any acquisition we have made to date. On the other hand, this situation carries a greater possibility of gain." There is no mention of customer deposit base.

16. At this stage, there was no written agreement.

17. The price paid for the bank stock in relation to its book value was not far afield from other such purchases by plaintiff. If the Gregory loans had been written off prior to the time the $60 per share was set, the price would have likely exceeded the average prices based on book value. The $60 purchase price should be compared to the $25.91 book value on 9–30–78.

*The Agreement and Closing*

BEA remained in charge of its operations and continued to function as an independent bank until the acquisition was completed on February 28, 1979. On June 12, 1978, BEA signed a Merger Agreement with the plaintiff. The Merger Agreement reflected the $60 per share price, but included no allocation of the price to specific assets or liabilities, i.e., no separately assigned value to any "customer deposit base." There were no early discussions or negotiations concerning the value of the customer deposit base (or "core deposits intangibles"). There is no evidence that plaintiff specifically considered the value of the customer deposit base as a separate item until July 12, 1978, when the plaintiff's senior accountant (Harvey Campbell) sent a memorandum on the matter to Mr. Woods, referring to the tax advantage of such an approach.[18]

On August 25, 1978, the plaintiff and BEA executed an Agreement of Purchase and Assumption. Pursuant to the terms of that Agreement, the plaintiff would pay BEA the sum of $4.8 million (that is, $60 for each of 80,000 shares), and assume all liabilities of BEA, in return for the acquisition of all assets of BEA. The Agreement also provided that the purchaser would reemploy all of the employees of BEA. The Agreement provided a preliminary allocation of the purchase price among BEA's assets as follows:

| | |
|---|---|
| Bank Premises & Equipment | $ 1,800,000.00 |
| Customer Deposit Base | 1,700,000.00 |
| Loan Portfolio | 25,793,000.00 |
| Investment Portfolio | 3,489,000.00 |

**18.** Under Accounting Principles Board Opinions Nos. 16 and 17, which relate to business combinations, AmSouth was required to record the acquired assets by allocating the purchase price to the individual identifiable assets, both tangible and intangible. In a July 12, 1978 letter, one of plaintiff's accountants stated, "the main reason we want to do this is goodwill amortization is not deductible for tax purposes...."

**19.** There is no evidence that BEA placed any separate value on the customer deposit base. If they did, they effectively sold it for about 55% of the value which plaintiff has placed on it.

| | |
|---|---|
| Cash & Other Assets | $ 7,745,000.00 |
| Total Assets | $40,527,000.00 |
| Less: Liabilities Assumed | ($35,727,000.00) |
| Total Purchase Price | $ 4,800,000.00 |

This allocation was developed by AmSouth with little or no input by BEA.[19] The net cash payment was the same as agreed upon earlier before customer deposit base had been specifically discussed and considered. The plaintiff and BEA did not realistically *negotiate* an allocation to the value of customer deposit base. The plaintiff determined the categories and values as assigned in the contract documents. BEA's primary concerns were first to negotiate the best price per share and, secondarily, to protect its employees. The Agreement tentatively allocated the purchase price to various assets and liabilities, including $1.7 million to "Customer Base," but provided that the purchase price could be reallocated at the time of actual closing. This price allocation by the plaintiff had no adverse tax impact upon BEA or its shareholders.[20]

After various AmSouth personnel evaluated certain aspects of BEA, and after each asset had been appraised or otherwise evaluated, AmSouth and BEA executed an Amendment to the Purchase and Assumption Agreement on February 28, 1979, the day before the acquisition closed. The Amendment to the Purchase and Assumption Agreement recorded the following revised allocations of the purchase price among the various assets purchased. (The closing was on this basis).

| | |
|---|---|
| Bank Premises & Equipment | $ 2,026,788.12 |
| Customer Deposit Base | 1,679,045.19 |

**20.** The Proxy Statement of BEA to its own shareholders, dated November 14, 1978, described the acquisition in these terms:

> In its simplest terms, the Bank [BEA] would sell and transfer to Bancorporation [plaintiff]'s newly organized subsidiary, Lee County Bank, the Bank's properties, assets, and Lee County Bank would assume all debts, liabilities and obligations of the Bank and pay the Bank $4,800,000. On the date of the sale Lee County Bank will have changed its name to "The Bank of East Alabama" and will do business from the same offices and with the same directors, officers and employees as were associated with the Bank immediately before the assumption and purchase took place.

| | |
|---|---|
| Loan Portfolio | $ 27,630,537.16 [21] |
| Investment Portfolio | 3,134,305.00 |
| Cash & Other Assets | 5,382,143.67 |
| Total Assets | $39,852,819.14 |
| Less: Liabilities Assumed | ($35,052,819.14) |
| Total Purchase Price | $4,800,000.00 |

The customer deposit base was based on the evaluations of "outside" parties as suggested in Campbell's memorandum of July 12, 1978. No amount was allocated to goodwill or going-concern value.[22] At the time of the acquisition, AmSouth was the largest bank holding company in Alabama and BEA was the largest of eight banks in Lee County and, of course, the largest of three banks in Opelika. At the time, the BEA purchase was the plaintiff's largest purchase of a separate bank. There may be an inference that the regulatory authorities approved the transaction because of some perceived weakness in BEA's financial status and plaintiff's willingness to inject $500,000.00 additional capital notwithstanding normal antitrust considerations.[23]

Subsequent to this acquisition, the plaintiff continued operations in Opelika, at the same locations, with substantially the same personnel, under the same name, with the same Board of Directors and managed by the same officers. A customer entering the bank on March 1, 1979, the day after the closing, would have likely noticed no substantial difference in the operations. Plaintiff continued to use the name, "Bank of East Alabama," until 1983, when all its operations statewide adopted the name "AmSouth." The plaintiff, operating through the successor BEA, did not segregate or maintain the demand and savings accounts on deposit at BEA on February 27, 1979 (the day before the closing), separate and apart from the demand and savings accounts opened at BEA subsequent to that date.

For its income tax reporting purpose, plaintiff claimed that the "customer base" price of $1,679,045, which represented the residual, unallocated premium paid for the BEA assets, was a depreciable asset, and claimed depreciation deductions based on an amortization schedule of 40 years. The Internal Revenue Service, upon examination of the income tax returns of plaintiff, disallowed the depreciation deductions claimed for such "customer base." Thereafter, the plaintiff paid those income taxes assessed against it, together with appropriate interest, and filed claims for refund for various tax years seeking to recover those income taxes paid "resulting from the disallowance of amortization of a core deposit intangible."

### Court's Summary of BEA's Condition At Time Of Acquisition

The court was, of course, inundated with various financial reports, letters, minutes, etc.[24] Apparently, the plaintiff senses that if it can establish that BEA had no goodwill or was on the brink of failure or otherwise debilitated, its case in this relatively new area is somewhat strengthened. The defendant, whether necessary or not under the circumstances, of course reacts and suggests that BEA was not nearly as decrepit as plaintiff would have the court believe. To the extent that this issue is greatly significant, one way or the other, it can be reduced to a much less complicated essence than has been suggested.[25]

Basically, the oldest and largest bank in Lee County (chartered in 1869 as a private bank) was victimized, over a relatively brief

21. The loans of BEA were not re-valued. Theoretically, they could have been valued upward or downward depending on interest rates, likelihood of collection, etc.

22. Neither Ernst nor Golembe, plaintiff's experts, attempted to value the "goodwill" of BEA. Both experts assumed that, because there were no residual values, there was no goodwill. Neither Ernst nor Golembe attempted to value any "going-concern" value of BEA.

23. At the time of plaintiff's application(s) for approval, however, there were already three

multibank holding companies represented in the county.

24. For more detail as to BEA's financial history, see defendant's exhibit 26.

25. While the court is not necessarily convinced that the relative strength of BEA at the time of purchase, short of a closing or a separate "sale" of deposits is decisive on the main issue, it has made considerable findings on the issue because the parties have offered substantial evidence in this regard.

span, by a president who used the bank for his own benefit and for the benefit of the Gregorys and perhaps others of similar stripe.[26] By the time the other officers and directors, none of whom are implicated in any negative way by the evidence, awoke, the bank was in relatively bad financial shape because of bad loans, excessive expenses and some high interest rate deposits acquired in a deregulating market. This status was not wholly unusual for the times. The bank was also somewhat victimized by the adverse publicity generated by the associated criminal charges against the same president. While such publicity is obviously not to be desired, there is no substantial evidence that the publicity *itself* adversely affected the bank's financial status or goodwill.[27] There was no deposit "runoff," silent or otherwise, and the leveling of deposit growth rate could be reasonably attributed to the increase in the number of banks in the county and the expanding of statewide bank holding company influence in the market.

There is little question that the bank's financial status had been impaired, primarily because of bad loans, and that it required additional capital injection.[28] While BEA's capital position worsened, there is no real evidence that its goodwill had subsided.[29]

Plaintiff has tended to overemphasize the influence of the publicity concerning the president. The bad loans caused the problem. FDIC noted in its November 1976 report that earnings had not kept pace with deposit growth. The primary problem was such McCullough allowed borrowings as the Scottsboro bonds and the Gregory loan(s). The reputation of the new president Botsford and the other officers and directors helped offset most of the bad publicity. After McCullough resigned in December 1976, BEA began to show some improvement because of better management.[30] It would have likely required additional capital, however, to have profitably survived. Its somewhat improved condition was indicated by the escalating per share offers of First Alabama and plaintiff.[31] In August 1977, the FDIC noted that the financial condition was still not good but better.[32] The various offers of First Alabama and plaintiff were more geared to the Gregory line and other loan values than to goodwill.

In late 1977, BEA's directors recognized that BEA had to have additional capital. They further recognized that a public sale of stock and/or debentures was inappropriate under the circumstances. While some of the directors were willing to further invest substantial sums, approximating one-half of the anticipated needs, some

---

**26.** In its application to the Federal Reserve Board for approval of the purchase, the plaintiff acknowledged that the "root of [BEA's] problem has been personnel related." In other instances, plaintiff stated that the problem was loan losses, high operating expenses and *considerable asset growth.* There was no mention of declining goodwill prior to the announced purchase.

**27.** In the summer of 1978, BEA conducted a lobby survey of its own customers that ranked BEA ahead of its own competitors in the categories of friendliness, loan availability, aggressiveness, community reputation and convenience.

**28.** Loan write offs were reflected in a variety of ways; lower book value, earnings' declines, capital ratios, reduction in compensating balance deposits of such borrowers, liquidity deficiencies, etc. Regardless of the measurement and regardless of McCullough's reputation, the bank's primary problem was bad loans made by a bad president during a particular span of time. While this was of financial interest to the directors and stockholders, there is no substan-

tial evidence that it was of interest to depositors or that it adversely affected goodwill.

**29.** Lower capital ratios had been the trend in banking since 1933 after a greater dependence on FDIC insurance than reserves. While the court does not suggest that BEA's loan portfolio was typical, larger banks with publicized large and "bad" Third World type and commercial loans have survived without significant impairment of goodwill.

**30.** In 1977, the deposits remained stable even though some high interest rate CD's were voluntarily relinquished.

**31.** The court has provided some information concerning various measures of financial condition. All of these were obviously influenced at various times by loan conditions and expenses.

**32.** FDIC never took any formal action against BEA. Its only official action was to impose the never enforced condition of increased capital.

were not. The directors opted for a sale to plaintiff. After negotiations during which the plaintiff's offer was raised to a level acceptable to BEA's directors, the bargain was struck without any prior indication of a consideration by plaintiff of capitalizing and amortizing a core deposit base. The basic result was to continue the bank as it was, except for $500,000.00 additional capital to offset loan losses.

Lee County was recognized by plaintiff to be a highly desirable market. Plaintiff's witness, Dr. Morgan, perhaps was correct when he stated that the bank was in a somewhat "distressed" condition, but not failed. Former BEA Vice President Walter Parrent referred to the bank as "troubled," but not failed. Former BEA Acting President Botsford testified that the bank was not failing. He also testified that BEA had a broader customer base in numbers than its competing banks, that there was no deposit runoff and that he was satisfied with the price per share paid by plaintiff.

### The Customer Deposit Base

By acquiring BEA's assets, including its customer relationships, AmSouth was able to forego the substantial marketing expense and business development normally needed initially to obtain deposit relationships. In the commercial banking industry, deposit relationships represent the most favorable source of funds and are one of the most important factors with respect to the profitability of a commercial bank. Deposit relationships tend to be the focal point for other bank customer relationships. Since the ability of a bank to attract and retain core deposits is the main factor in the size and scope of its business, most banking services are designed to keep and develop those deposit relationships. Once a deposit relationship is established, it generally will be retained, all things being equal, for a period of time with little, if any, need for the bank to engage in further *direct* marketing efforts. At some point, deposit relationships with specific customers eventually terminate because the circumstances of a bank's customers change with time. They are also regenerated via family members and business successors, new business, etc.

AmSouth employed the accounting firm of Ernst & Ernst and the bank consulting firm of Golembe & Associates, Inc. to determine the value and useful life of the customer deposit base to be acquired from BEA. The firms conducted their evaluations in the fall of 1978. Each firm developed separate approaches to determine the value and longevity of the customer deposit base. The Golembe report assigned a value of $3 million to the BEA customer deposit base to be acquired by AmSouth. The Ernst & Ernst report assigned the BEA deposit base a value of $3.1 million. AmSouth adopted the Ernst & Ernst approach to amortizing the intangible asset over a forty year period for business accounts and a twenty-five year period for individual accounts using an accelerated method.[33]

The Ernst & Ernst report determined the present value of the customer deposit base by calculating the differential in the incremental borrowing rate of AmSouth and the alternative funds rate (based on BEA's cost of funds and the cost of AmSouth's equity investment in BEA), multiplied by the projected average balances of the customer deposit base for the estimated useful life of that deposit base. The Golembe report defined the value of the deposit base as the discounted present value of the projected net income to be obtained from that part of the acquired deposit base that remains in

**33.** In December 1978, Golembe in its report estimated a value of $3 million on the customer deposit base and assigned it a forty-year life. In February 1979, Ernst, after reviewing the Golembe Report, raised its estimated value from 2.5 million dollars to 3.1 million dollars, and lowered the useful life from 50 years to 40 years. Ernst used all deposits in its calculations, and did not exclude certificates of deposits over $100,000. Ernst made no allowance for ready reserve funds which must be maintained in cash form within the Federal Reserve system, and hence cannot be invested. Ernst included money market certificates that did not meet the basic definitional requirements to be core deposits. Ernst also included public funds on deposit even though such funds have specific pledging requirements and cannot be invested like other deposits.

each successive year over its useful life.[34] The Ernst & Ernst and Golembe reports attempted to determine the useful life of the customer deposit base by evaluating BEA's history of closed accounts to develop an annual closing rate. The reports also utilized mortality rates and relocation rates in attempting to determine the customer deposit base's useful life.[35] While specific customer deposit relationships obviously have some limited life, the court cannot find that there is any scientifically accurate way to measure such life span. The estimates of the two evaluators *may be* reasonable.

The customer deposit base, or the core deposit intangible, is, at best, an imprecise concept. The court was presented with several definitions and evaluation approaches. There appears to be an agreement that customer deposit base, or core deposits, should have three basic features. Core deposits should be a relatively low-cost source of funds to the bank, reasonably stable over time and relatively insensitive to interest-rate changes. Not all deposits at a financial institution are core deposits. During the time period 1977 through 1979, the type of account that most clearly meets the three features set out above would be the checking account, which paid no interest and was ongoing in nature. On the other end of the spectrum would have been large amount certificates of deposit: these accounts paid near money market rates, were for a set period of time and were highly sensitive to interest-rate changes. Even smaller amount certificates of deposits are sensitive to interest changes.

The plaintiff's treatment of the alleged asset failed to comply with generally accepted accounting principles (GAAP) in several respects. Under Accounting Principles Board Opinions Nos. 16 and 17, other tangible assets should have been proportionately reduced to eliminate negative goodwill caused by the 3.1 million dollar estimate of the core deposit base value over and above the purchase premium of $1,679,054. Plaintiff failed to do this. Financial Accounting Standards Board Statement No. 72 requires periodic updates of the estimation of the intangible value. Plaintiff failed to do any follow-up studies of closing rates, average balances or of any other type. Finally, the loan portfolio was not independently appraised, as required by GAAP, but was assumed to have a fair market value equal to face value.

Ernst, as well as Golembe, used a "snapshot" approach. This approach assumes that all deposit accounts at BEA on a specific day will never experience any material growth, and eventually will decrease and be closed out. The "snapshot" approach does not specifically allow for additional deposit growth in existing accounts or existing customers opening new types of accounts at the bank. This "snapshot" approach also places no value on the ability of the bank to draw in and acquire new customer relationships. The "snapshot approach" also used the date of December 31, 1978, as the baseline for the total deposits at BEA, but provided no justification for the use of that date, rather than the date the parties agreed to close the sale. Total deposits at BEA varied by some $5 million over the course of 1978. The Ernst and Golembe Reports made no attempt to measure the value of the loan business or to determine how the two components of the business interact and affect the value of each other.[36]

---

**34.** The plaintiff's experts determined the customer deposit base value by considering the value of having deposits at a lower rate than market. This may be significantly explained by the FDIC insurance coverage. It would appear that, if plaintiff's theory is carried to a logical extreme, any funds which any acquired business has borrowed at less than the existing market rate could be somehow capitalized and converted into an amortized deduction, off-setting the income which would otherwise result from the advantage.

**35.** Golembe's various conclusions as to value, age, etc. varied with various drafts discussed with plaintiff.

**36.** There is some recognition that the phasing out of Regulation Q has had and will have the effect of reducing core deposits or the significance thereof. There is no evidence that plaintiff's experts considered this phenomenon.

### Accounting Principles & Regulatory Requirements

There are substantial differences between Generally Accepted Accounting Principles (GAAP), regulatory accounting principles and accounting for income taxes, because each has a separate purpose. Accounting and accounting principles vary according to the purpose to be served. Accounting data may be reported to provide financial information to the public, to serve management, to meet regulatory authority requirements, or to satisfy taxing authority requirements. APB 16 and 17 are basically premised on the thought that we can give more information if we attempt to break intangible assets into more categories whether entirely separable from goodwill or not. The attempt is made even though there may be an overlap. Regulatory accounting is generally akin to financial accounting with a view toward conservatism, not taxation. The trend of the regulatory authorities has been from not allowing goodwill to be capitalized at all to allowing capitalization with an early write-off. Such capitalization may help a problem institution look more favorable for a period of time. GAAP requires that intangible assets be identified, quantified and amortized whenever possible. Not only core deposit base, but also goodwill itself is capitalized and amortized under GAAP and allowed by federal agencies other than IRS.[37]

State of Financial Accounting Standards No. 72 states, *inter alia:* "The fair values of such assets that relate to depositor or borrower relationships shall be based on the estimated benefits attributable to the relationships that exist at the date of acquisition *without regard to new depositors or borrowers that may replace them.*" (Emphasis added). While this premise may be acceptable as an accounting principle, it is not so clear that it is consistent with the requirements of Section 167(a).

In 1982, core deposit base amounts were made amortizable over a ten year period, for all bank regulatory purposes, on a case-by-case basis. In 1985, core deposit treatment was changed once again; the amortization period was lengthened, and the core deposit intangible was no longer used to calculate capital sufficiency which was the major concern of bank regulators. The rules of income tax accounting never permit the depreciation of goodwill, and any other intangible asset may be depreciated only if it can be shown that the asset is "separate and distinct" from goodwill and if it has a limited useful life, the duration of which may be ascertained with reasonable accuracy.

This court is not greatly influenced, as to the pertinent issue, by the allowance of the capitalization and amortization of a customer deposit base by either GAAP or regulatory authorities. This recognition had been on a "case-by-case" basis and has been accompanied by the allowance of an amortization of goodwill itself over a longer term.[38] The FDIC itself has had concerns with the concept.[39] There is no indication that these other federal agencies have been concerned about the tax ramifications of any such procedure. Plaintiff's Exhibit 65 is an article which suggests that the value assigned may affect the regulatory approv-

---

**37.** As between goodwill and customer deposit base, the primary distinction which the regulatory authorities make is in the period of amortization.

**38.** It is difficult to tell whether the office of the Comptroller of Currency (OCC) follows the lead of FDIC or vice versa. They are usually consistent to a high degree. They apparently do not act entirely independently of each other. Both allow some recognition of a customer deposit base on a case-by-case basis. It is not fully clear to the court exactly when and if various banking regulatory authorities either "recognized," "permitted the recognition of," or did not allow the capitalization and amortization of core de-

posit base values. It is not necessary to the court's conclusion to know these exact dates because no regulatory authority decision has been based on factors entirely consistent with or in contemplation of § 167(a). The conservative principles applicable to GAAP and other regulatory agencies may be at cross purposes with tax accounting.

**39.** In November 1978, the FDIC expressed dissatisfaction to plaintiff's "carrying the intangible accounts on its books because of the implications involved for 'creating' capital." Plaintiff agreed to book core deposits on a basis which would reflect in the call report "as if the intangible asset didn't exist."

al of acquisitions. Anderson, *Valuing the Core Deposits of Financial Institution: A Statistical Analysis,* Journal of Bank Research, Spring 1986. In the same article, it is stated that "[t]he OCC analysis assumes that an acquired core deposit base is comprised of *both goodwill and* a wasting tangible asset." (Emphasis added). Further, that, "Hence, while the SEC, OCC and FDIC regulations allow asset value to be reduced through time based on actual experience of loss of accounts, tax amortization must be based upon *ex ante* forecasts of the prospective decline in asset value." The article does suggest a method of evaluating a core deposit base. The regulatory authorities have generally followed accounting "principles," not tax regulations, as a guide.

The allowance by GAAP and other regulatory agencies of a recognition of a customer deposit base as an "identifiable" part of goodwill, is not necessarily the same as suggesting that it is "separate and distinct" from goodwill. Something may be reasonably "identifiable," as part of a whole, yet not separate and distinct from the whole.

### Further Observations
### As To Customer Deposit Base

Attached hereto as an addendum is a brief summary of the reports and opinions of the experts who testified at the trial. The court also notes the various statements in Sinkey, *Commercial Bank Financial Management in the Financial Services Industry,* (2d ed 1986)[40] (particularly, see pages 695–99, 702–03). The court has noted the statements concerning the rationale of the regulatory authorities, particularly FDIC, in allowing the capitalization and amortization of goodwill and other intangible assets. There is a suggestion, not likely totally apochryphal, that "the concern with appearances enables regulators to tell watchdog Congressmen that bank capital positions have been shored up and that the banking system is safe and sound." And a further suggestion that "this thinking was especially prevalent in the situation where a viable bank had taken over, via a deposit assumption, a failed bank or participated in the emergency merger of a failing institution." *Id.* at 702. Sinkey adds, "The phony accounting acceptable to regulators should have no standing in *financial or tax matters." Id.* at 703. (Emphasis added).

Plaintiff's witness, Dr. Morgan, cited an example (Sears Savings Bank) where deposit liabilities alone were "purchased." While, arguably, such liabilities may be "purchased" and create an intangible asset if purchased separately, it does not necessarily follow that when deposit liabilities are assumed as a part of a going concern that they can always be separated from goodwill. The court does not agree with Dr. Morgan that it is irrelevant whether old management stays in place after the acquisition. Personnel, location, age of business, etc. are all goodwill factors which must be considered if the bank is sold as a going concern.[41] Furthermore, it is well known in the banking industry that loans are often made to attract deposits. While some deposits may remain by inertia in the absence of loan capacity, many would not. Furthermore, deposit retention is particularly subject to interest rate fluctuations and the ability to meet the competition.

The regulatory authorities' recognition of the customer deposit base has been

---

**40.** A collateral issue in the case, as to which the court reserved ruling, was the admissibility of certain impeaching evidence, offered by plaintiff, concerning this treatise of Joseph F. Sinkey, Jr., also offered by plaintiff. The court has determined that since, under the rules, a party can impeach his own witness and since Sinkey is an out of court "declarant," logic dictates that the evidence as to his association with defendant is admissible. His statements are not, however, thus destroyed, because they are largely supported by other evidence in the case.

**41.** Query: If BEA had lost its goodwill, as suggested by plaintiff, why did its depositors not leave? If some depositors leave a bank because of a lack of goodwill, do those that remain do so because of goodwill? Plaintiff's witness, Dr. Morgan, defined goodwill as the ability to attract new business; not the ability to retain business. This is too narrow a definition. Satisfied customers often help create goodwill for a bank. One of the recognized elements of goodwill is "continued" patronage.

somewhat diluted. In 50 Fed.Reg. 11131–32 (Mar. 19, 1985) the FDIC commented, *inter alia,*

> The FDIC has long been opposed to the inclusion of intangible values in its determination of a bank's equity capital as a matter of general policy. The FDIC Statement of Policy on Capital Adequacy which was adopted by the Board of Directors on December 17, 1981 continued a long-standing practice of excluding intangible assets as a component of equity capital. Prior to the adoption of this statement of policy, and for a short time thereafter, the FDIC generally even required that intangible assets held by banks be charged off and not be reflected on the bank's books. The FDIC later permitted banks to record intangible assets on their books; however, it has continued to deduct such assets from equity capital when assessing capital adequacy.

> \*    \*    \*    \*    \*    \*

Intangible assets may be characterized according to the manner in which they are acquired, their separability from an entire banking organization, their marketability, and the certainty of the future cash flows or income stream they represent. The intangibles encountered in banks are typically acquired in a purchase of all or part of another business enterprise although mortgage servicing rights can also be acquired by themselves as a single asset. *Along a similar vein, intangibles such as goodwill and core deposit intangibles cannot be separated from the remainder of a bank's assets and sold or otherwise disposed of apart from the bank as a whole or a substantial part of it whereas such a separation is possible with* mortgage servicing rights. Due in part to this separability, there is a fairly active market for these servicing rights which in turn adds a degree of liquidity to this class of intangibles. *The estimated future cash flows or income streams associated with the rights or values underlying intangible assets vary considerably with respect to their certainty and predictability. Interest rate deregulation has been undermining the concept of the low cost core deposit base and assumptions about the average remaining lives of such deposits when acquired and the interest rate spreads projected over these lives have made the valuation of purchased core deposit intangibles increasingly subjective. As for goodwill, the future income stream it purports to represent is even less quantifiable and the value assigned to. this intangible may be associated more with what a bank is willing to pay to expand into new markets or to increase market penetration. On the other hand, mortgage servicing rights are derived from known servicing fee rates on a specified group of mortgages with contractual repayment terms and reasonably predictable prepayment characteristics.*

*Id.* (Emphasis added).

Similar comments had previously been made by the Comptroller of the Currency as well. 50 Fed.Reg. at 10212–13 (Mar. 14, 1985).

Both comments suggest that, unlike intangible mortgage servicing rights, core deposit intangibles cannot be sold *separately* by an institution.

### CONCLUSIONS OF LAW

Two cases shed considerable light on the legal issues in this case. The first is *Houston Chronicle Publishing Co. v. United States,* 481 F.2d 1240 (5th Cir.1973), *cert. denied,* 414 U.S. 1129, 94 S.Ct. 867, 38 L.Ed.2d 754 (1974) because its stated principles are generally apt and, except for factual differences, controlling. The second is *General Television, Inc. v. United States,* 449 F.Supp. 609 (D.Minn.1978), *aff'd* 598 F.2d 1148 (8th Cir.1979) (based on the district court's "well-reasoned opinion") because it so succinctly and adequately outlines the applicable principles. Since, however, this court, in this instance, has perhaps too much tendency toward prolixity, it

will consider other cases.[42]

### Effect of Accounting Principles and Regulatory Authority

■ While the "recognition" of the core deposit base concept in generally accepted accounting principles and, to a degree, by regulatory authorities serves to separate the concept from being merely phantasmal or factitious or simply ingenious,[43] it does not serve as an answer in and of itself. It is well recognized that methods of financial accounting imposed or authorized by regulatory agencies or generally accepted accounting principles, while they may be of some significance, are not controlling as to tax accounting or tax law. *See City Gas Co. v. Commissioner,* 689 F.2d 943, 949 (11th Cir.1982).[44] In *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979), the Court said, *inter alia:*

"[T]o say that in performing the function of business accounting the method employed by the Association 'is in accord with generally accepted commercial accounting principles and practices,' " the Court concluded, "is not to hold that for income tax purposes it so clearly reflects income as to be binding on the Treasury," *Id.,* [*American Auto Assn. v. U.S.,* 367 U.S. 687] at 693. [81 S.Ct. 1727, 1730, 6 L.Ed.2d 66] "[W]e are mindful that the characterization of a transaction for financial accounting purposes, on one hand, and for tax purposes, on the other, need not necessarily be the same." *Frank Lyon Co. v. United States,* 435 U.S. 561, 577, [98 S.Ct. 1291, 1300, 55 L.Ed.2d 550] (1978). *See Commissioner v. Idaho Power Co.,* 418 U.S. 1, 15 [94 S.Ct. 2757, 2765–66, 41 L.Ed.2d 535] (1974). Indeed, the Court's cases demonstrate the divergence between tax and financial accounting is especially common when a taxpayer seeks a current deduction for estimated future expenses or losses. *E.g., Commissioner v. Hansen,* 360 U.S. 446 [79 S.Ct. 1270, 3 L.Ed. 2d 1360] (1959) (reserve to cover contingent liability in event of nonperformance of guarantee); *Brown v. Helvering,* 291 U.S. 193 [54 S.Ct. 356, 78 L.Ed. 725] (1934) (reserve to cover expected liability for unearned commissions on anticipated insurance policy cancellations); *Lucas v. American Code Co., supra* (reserve to cover expected liability on contested lawsuit).

439 U.S. at 541, 99 S.Ct. at 785.

\*     \*     \*     \*     \*     \*

The primary goal of financial accounting is to provide useful information to management, shareholders, creditors, and others properly interested; the major responsibility of the accountant is to protect these parties from being misled. The primary goal of the income tax system, in contrast, is the equitable collection of revenue; the major responsibility of the Internal Revenue Service is to protect the public fisc. Consistently with its goals and responsibilities, financial accounting has as its foundation the principle of conservatism, with its corollary that "possible errors in measurement [should] be in the direction of understatement rather than overstatement of net income and net assets." In view of the Treasury's markedly different goals and responsibilities, understatement of income is not destined to be its guiding light. Given this diversity, even contrariety, of objectives, any presumptive

---

**42.** *Winn–Dixie Montgomery, Inc. v. United States,* 444 F.2d 677 (5th Cir.1971) also has significant and persuasive application to this case, both with regard to its consideration of the definition of goodwill and its consideration of the purchase of a going concern. The court does not intend to diminish the significance of *Winn–Dixie* by not widely quoting from it. It may be fully controlling. The court has emphasized *Houston Chronicle* only because it is a later and more widely cited case.

**43.** Converting liabilities into assets has an initial ring of ingenuity if not disingenuousness.

**44.** An obvious distinction between the policies of bank regulatory authorities and the Internal Revenue Service is illustrated by the policies relating to goodwill. While the bank regulatory authorities require goodwill to be charged off over a period of time, internal revenue laws and regulations clearly do not allow an amortized deduction.

equivalency between tax and financial accounting would be unacceptable.

This difference in objectives mirrored in numerous differences of treatment. Where the tax law requires that a deduction be deferred until "all the events: have occurred that will make it fixed and certain," *United States v. Anderson,* 269 U.S. 422, 441 [46 S.Ct. 131, 134, 70 L.Ed. 347] (1926), accounting principles typically require that a liability be accrued as soon as it can reasonably be estimated. Conversely, where the tax law requires that income be recognized currently under "claim of right," "ability to pay," and "control" rationales, accounting principles may defer accrual until a later year so that revenues and expenses may be better matched. *Financial accounting, in short, is hospitable to estimates, probabilities, and reasonable certainties; the tax law, with its mandate to preserve the revenue, can give no quarter to uncertainty.* This is as it should be. Reasonable estimates may be useful, even essential, in giving shareholders and creditors an accurate picture of a firm's overall financial health; but the accountant's conservatism cannot bind the Commissioner in his efforts to collect taxes. "Only a few reserves voluntarily established as a matter of conservative accounting." Mr. Justice Brandeis wrote for the Court, "are authorized by the revenue Acts." *Brown v. Helvering,* 291 U.S. at 201–202 [54 S.Ct. at 360].

Finally, a presumptive equivalency between tax and financial accounting would create insurmountable difficulties of tax administration. Accountants long have recognized that "generally accepted accounting principles:" are far from being a canoical set of rules that will ensure identical accounting treatment of identical transactions. *"Generally accepted accounting principles," rather, tolerate a range of "reasonable" treatments, leaving the choice among alternatives to management.* Such, indeed, is precisely the case here. Variances of this sort may be tolerable in financial report-ing, but they are questionable in a tax system designed to ensure as far as possible that similarly situated taxpayers pay the same tax. If management's election among "acceptable" options were dispositive for tax purposes, a firm, indeed could decide unilaterally—within limits dictated only by its accountants— the tax it wished to pay. Such unilateral decisions would not just make the Code inequitable; they would make it unenforceable.

439 U.S. at 542–44, 99 S.Ct. at 786–87. (Emphasis added). (Footnotes omitted).[45]

The court notes that while the positions of the regulatory authorities, to the extent that they are pertinent, are perhaps entitled to more weight than "generally accepted accounting principles," *their* respective "principles of conservatism" may be akin. The mere fact that "somebody has tried it" does not work an amendment to the revenue laws and regulations. Here, the attempt has resulted from a recognition by plaintiff's accountants, after the purchase had been agreed upon, that, "somebody has tried it." *See also Commissioner v. Idaho Power Co.,* 418 U.S. 1, 15, 94 S.Ct. 2757, 2765–66, 41 L.Ed.2d 535 (1974); *Commissioner v. Lincoln Savings & Loan Assn.,* 403 U.S. 345, 359, 91 S.Ct. 1893, 1901–02, 29 L.Ed.2d 519 (1971); *American Automobile Assn. v. United States,* 367 U.S. 687, 693, 81 S.Ct. 1727, 1730, 6 L.Ed.2d 1109, *reh'g denied,* 368 U.S. 870, 82 S.Ct. 24, 7 L.Ed. 70 (1961).

### *The Applicable Tax Law*

The basic statutory provisions here applicable are found at Section 167(a) of the Internal Revenue Code, which provides as follows:

> (a) *General Rule.*—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
>
> (1) of property used in the trade or business, or

**45.** Footnote 22 provides a quote of illuminating insight. One authority is quoted as saying that accountants "are quite prone to define; generally accepted as 'somebody [has] tried it.'"

(2) of property held for the production of income.

\* \* \* \* \* \*

The related Treasury Regulation Section 1.167(a)–3, states:

*Intangibles.* (TD 6182, filed 6–11–56, amended by TD 6452, filed 2–3–60, republished in TD 6500, filed 11–25–60.) If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to good will. For rules with respect to organizational expenditures, see section 248 and the regulations thereunder. For rules with respect to trademark and trade name expenditures, see section 177 and the regulations thereunder.

The applicable law has been summarized in *Houston Chronicle v. United States,* 481 F.2d 1240 (5th Cir.1973), as follows:

"[I]ntangible capital assets ... may be depreciated for tax purposes if taxpayer sustains his burden of proving that the [alleged assets] (1) have an ascertainable value *separate and distinct from good-will,* and (2) have a limited useful life, the duration of which can be ascertained with reasonable accuracy."

481 F.2d at 1251 (emphasis added).

An initial inquiry thus must be, "what is goodwill?" That issue is summarized in *Houston Chronicle.*

"[T]he nature of goodwill is the expectancy that 'the old customers will resort to the old place,'...."

\* \* \* \* \* \*

"[T]he essence of goodwill is the expectancy of *continued* patronage, *for whatever reason.*"

(Emphasis added).

\* \* \* \* \* \*

"[T]o the extent [a given item or asset] contributes to the expectancy that the old customers will resort to the old place it is an element of goodwill."

"This Court has held that ... goodwill is acquired by the purchaser of a going concern where the 'transfer enables the purchaser to step into the shoes of the seller;' "

\* \* \* \* \* \*

"We have also said that goodwill is transferred where, as here, the buyer continues the seller's business uninterrupted, using primarily the seller's employees, and utilizing the seller's name.... It is immaterial that the agreement did not use the term 'goodwill,' for '[t]he use of these words is, of course, not necessary if in fact what is transferred does give to the purchaser everything that can effectively aid him to step into the shoes of the seller.' "

481 F.2d at 1247. In a later reference to another case, the court stated, "What taxpayer had obtained was the ongoing expectation that customers would utilize its services in the future, the archtypical element of goodwill." 481 F.2d at 1248. *Houston Chronicle* also notes that, as a matter of conclusive presumption and law, goodwill is not depreciable, 481 F.2d at 1247–48 and that the taxpayer "bears all burdens in regard to establishing its right to claim a § 167(a) deduction." 481 F.2d at 1245. Applying the general principles enunciated in *Houston Chronicle,* this court initially tends toward the conclusion from the facts stated above that the core deposit base which plaintiff has attempted to establish is not "separate and distinct from goodwill." The court notes that the deposit relationships are associated with continuing favorable customer partronage.[46] The eco-

---

**46.** In *Metropolitan Bank v. St. Louis Dispatch Co.,* 149 U.S. 436, 446, 13 S.Ct. 944, 948, 37 L.Ed. 799 (1893), the court suggests that goodwill is

nomic value of the asset derivative of these deposit relationships may "fluctuate but does not necessarily diminish." *General Television*, 449 F.Supp. at 611.

### The Facts In Other Cases

While the general principles enunciated in *Houston Chronicle* and *General Television* appear to provide the answer, the court feels compelled to consider other cases because, as is stated in *Houston Chronicle*, "[e]ach [§ 167(a)] case seems to revolve on the precise nuances of its facts, and we must thus begin our analysis with an in-depth look at the facts before us." 481 F.2d at 1243.[47] The facts in *Houston Chronicle* itself are distinguishable from those here in substance as well as in form. There are two notable distinctions. (1) In *Houston Chronicle*, the taxpayer did not "step into the shoes of the seller." To the contrary, it did not intend to continue to publish a newspaper under the seller's name and "did not consider the subscription lists to be self-regenerating assets and considered them valuable only to the extent they furnished names and addresses of prospective subscribers to *The Houston Chronicle*." 481 F.2d at 1244.[48] (2) Value was computed based, not on further earnings or savings, but on the cost of obtaining subscribers. The amount was not in dispute and a much larger amount (over ten times) was allocated to goodwill. The

court also, at least partially, based its decision on the premise that subscription "lists are bartered and sold as discrete vendible assets." 481 F.2d 1253. There is no substantial evidence that there is such a common practice with regard to deposit relationships. In any event, there was no discrete sale here.[49]

Plaintiff has strongly emphasized *Midlantic National Bank/Merchants*, Tax Ct. Mem. Dec. (P.H.) p 83, 581 (Sept. 21, 1983) because it is the only reported case which recognizes some intangible asset in bank deposit relationships. The case is, however, more revealing in its differences with the facts of this case than in its similarities. Among these differences are:

(1) The Eaton National Bank (ENB) whose deposits were "acquired," by Midlantic had been declared insolvent and *closed* by the Comptroller of the Currency.

(2) The court considered ENB to have been a bank "failure."

(3) The FDIC even decided that a purchase and assumption transaction was impracticable because of the circumstances.

(4) Midlantic Bank was only allowed to solicit depositors who had previously been paid off by FDIC.

(5) ENB was, in no fashion, acquired as a going concern.

---

the advantage or benefit, which is acquired by an establishment beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or *habitual customers*, on account of its *local position* or *common celebrity*, or reputation for skill, or affluence, or punctuality, or from other accidental circumstances or necessity, or *even from ancient partialities or prejudices.*
(Emphasis added).
As the oldest bank in Lee County, BEA certainly had the advantage of some "ancient partialities or prejudices."

**47.** While the court arguably rejected the so-called "mass asset" or "indivisible asset" analysis if applied as a *per se* rule, it did so in the context that the total issue is one of fact.

**48.** Deposits certainly tend to be self-regenerating—thus, bank growth.

**49.** This court recognizes that the sale in *Houston Chronicle* was not totally discrete. *Cf. General Television* where the court stated,

However, in the instances in which customer or subscriber lists have been determined to have an ascertainable value separate and apart from goodwill, the lists alone carried with them no expectancy of continued patronage. In the present case, what the plaintiff purchased was more than mere subscriber lists which could be used to identify potential customers; what it purchased was customer structures which included the expectancy of continued patronage. Therefore, because the purchases of the subscriber lists were actually purchases of customer structures with the expectancy of continued patronage and because the expectancy of continued patronage is the essence of goodwill, the subscriber lists constitute non-depreciable goodwill.
449 F.Supp. at 612.

(6) The deposits were apparently valued based upon the cost of acquiring similar deposits in the market.

(7) The bank successfully solicited only $2.5 million of some $16 million deposits of ENB after initially projecting the ability to acquire $8–10 million. The depositors had to apply to open a new account with Midlantic.[50]

(8) Midlantic stressed and emphasized to the depositors that it was an entirely different bank and removed all references to ENB's name.

(9) The court concluded that Midlantic acquired *no* goodwill of going concern value, that "it no longer existed" and had "no remaining goodwill to be acquired" and that the location acquired created a potentially negative influence because they experienced the trauma of the bank's failure and having to be paid by the FDIC.[51]

(10) The court looked upon the right acquired as being one of the opportunity to "attract" customers, not to retain the continued patronage of customers.

In brief, plaintiff argues, "BEA's failing condition and declining market share, coupled with the widely publicized defalcation and imprisonment of BEA's president (and Opelika's mayor) for activities he undertook involving BEA had damaged BEA's reputation in the community to the extent that goodwill was severely damaged." Further, that "[w]ithout question, BEA was not growing as were other local banks because it had no goodwill in the community." These are *ipse dixit* arguments with no substantial support in the evidence. There is no reasonable inference that the goodwill of BEA was severely injured, certainly not that it had none. If plaintiff's case depends on these arguments, it falls of its own weight.

*Midlantic* does tend to suggest that the life of a separately acquired deposit base may be ascertained with some degree of accuracy. It also indicates, however, that when deposit relationships are separated from a going concern, the deposits tend to diminish even with the opportunity to reestablish the relationship with another going concern.

Plaintiff has also emphasized the case of *Richard S. Miller & Sons, Inc. v. United States*, 537 F.2d 446, 210 Ct.Cl. 431 (1976). That case notes;

> Cases that have recognized a depreciation deduction for insurance expirations generally have found no goodwill to be present in the sale, i.e., where the seller had "run-down" the agency, ruined its reputation, and no goodwill was left; where the seller had gone out of the fire and casualty business but remained in other insurance business and did not sell goodwill; or where the seller's insurance business was primarily walk-in trade acquired as an incidental sideline to other activities.

537 F.2d at 452.[52]

The case is distinguishable, *inter alia*, because of the following quotes:

> Breman, Indiana, is a rural community with a population of 2,700 persons at the time of the sale and a trading population, within a 15 mile radius accessible to both agencies, of approximately 6,000 persons. Richard Miller, the founder and principal solicitor of Miller & Sons, knew by sight approximately 85 percent of the population of Bremen, and the principal method of selling insurance in the marketing area was through face-to-face contacts.

> The Arch Insurance Agency had been active in Bremen since the early 1930's

---

**50.** In this case, plaintiff "acquired" substantially all of BEA's deposits without any re-openings.

**51.** Plaintiff's argument that "Like the present case, the acquired bank in [Midlantic National Bank] had no goodwill in the community...." is specious. More than anything else, *Midlantic* demonstrates that deposit relationships, separated from a going concern and without goodwill, rapidly and significantly diminish. That did not occur here. Whether a different situation is

presented when a purchase and assumption is arranged by FDIC remains to be seen. Perhaps one of the benefits of such an arrangement is the continuation of patronage, location, personnel, etc.; all of which are elements of goodwill.

**52.** The court noted that "[t]he taxpayer has a heavy burden to establish a right to an allowance for depreciation for insurance expirations." 537 F.2d at 452.

and had competed with Miller & Sons after that agency was founded in 1961. 537 F.2d at 453.

\* \* \* \* \* \*

Although goodwill was a substantial element in the sale, the transfer of an ongoing business was not the primary objective sought by Miller & Sons. The transfer of goodwill, during the negotiations, was not bargained for specifically. After the sale, Miller & Sons did not use the Arch name, its location, its sales personnel, or office procedures. The sales contract did not include office equipment, furniture, motor vehicles, or chattel personal property, nor did it include intangibles such as cash, notes, accounts receivable, or uncollected premiums. 537 F.2d at 454.

\* \* \* \* \* \*

In the Bremen marketing area, Miller & Sons did not need to purchase the Arch expirations in order to gain an entree into the market, nor did it need the expirations to identify Arch clients. Acquisition of the body of information that was contained in the expirations permitted Miller & Sons to incorporate in its files information that otherwise could have been acquired by internal growth. 537 F.2d at 454.

\* \* \* \* \* \*

The value of the Arch expirations is measured by the costs Miller & Sons would have incurred to develop an equivalent quantity of new business. This requires information on three factors: (1) the number of new policies written; (2) the total expenses incurred by insurance operations; and (3) the proportion of total insurance operating expenses that are used to develop new business. 537 F.2d at 456.

The court may have, contrary to other holdings, allowed deductions based on hindsight.

*Banc One Corp. v. Commissioner*, 84 T.C. 476 (1985) effectively "punted" on the core deposit issue, holding that the taxpayer had not established a proper method for depreciating the deposits because of a "hindsighting" approach. There is a general discussion of deposits which includes the statement that "the economic value of core deposits rest upon their ability to generate a stream of earnings over a period of time." 84 T.C. at 490. The case does not address the issue of whether any such value is separate and distinct from goodwill.

The court will briefly allude to other cases cited by plaintiff. In *Holden Fuel Oil Co. v. Commissioner*, 479 F.2d 613 (6th Cir.1973), the seller sold customer lists only to a taxpayer who was already doing business in the market area. In *Commissioner v. Seaboard Finance Co.*, 367 F.2d 646, 651 n. 6 (9th Cir.1966), the court stated:

In making its premium allocation, the Tax Court noted that several of the usual good will characteristics were missing in this case—interest in sellers' personnel, interest in sellers' locations, and intention to utilize sellers' names. The Tax Court, however, did not hold that, because these elements of good will value are absent in this case, the premium or any part of it therefore represents value other than good will. The court was merely engaged in a process of reviewing the customary elements of good will, rejecting those which are inapplicable and accepting those which are applicable. This was appropriate procedure. As the District of Columbia Circuit said in *Burke v. Canfield, et al,* 74 App.D.C. 6, 121 F.2d 877, 880 "... good will must be dealt with legally in connection with the business of which it has been said to be parasitic."

Furthermore, a definite cost was assigned to each contract purchased.

In *Laird v. United States*, 556 F.2d 1224 (5th Cir.1977) *cert. denied*, 434 U.S. 1014, 98 S.Ct. 729, 54 L.Ed.2d 758 (1978), the limited useful life of the player contracts was apparently established with relative ease and was not contested by the Government. Apparently, the Atlanta Falcons football team started from scratch in Atlanta. It did not "step into" a business. Separation from a "bundle" of assets, was the apparent issue. The court did state that the franchise obtained from the NFL

"has the same significance as goodwill had in *Houston Chronicle.*" 556 F.2d at 1233.[53] In *Laird,* the $50,000.00 franchise fee was paid to the NFL; the player purchase payments to the NFL Commissioner as trustee for NFL member clubs. The case does not make it clear how the contract purchase price was apportioned among the various clubs. This court cannot equate the contracts in *Laird* with deposit relationships.[54] In addition, the trial court and the circuit court reduced the claimed allocation to contract rights of $7,722,914.02 to $3,035,000.00. Here, other than by some totally arbitrary means, there is no such basis for this court to reallocate the amounts suggested by plaintiff, when plaintiff has allocated nothing to goodwill.[55]

*Donrey, Inc. v. United States,* 809 F.2d 534 (8th Cir.1987) perhaps unduly relies on *Houston Chronicle* without recognizing the fact in that case the newspaper did not continue under the same name. Furthermore, the court noted that

> One of Donrey's experts testified that the value of the subscription list is related to this revenue enhancement—it is the present value of the difference in advertising revenues generated by the subscription list as compared to the revenues of an equivalent paper without a subscription list. This value was thus characterized as being separate and apart from goodwill.

809 F.2d at 536.

*First Hawaiian, Inc. v. United States* No. CV84-0246 (D.Haw. Jan. 28, 1986), *aff'd,* 833 F.2d 1016 (9th Cir.1987) is not a deposit case. It made an *arbitrary* allocation between goodwill and a loan portfolio "intangible" which is recognized by FDIC to have a more distinguishable value than deposits. Furthermore, there was a $17. million dollar run on deposits in a one month period, indicating a lack of goodwill. There would appear to be a significant difference between increasing the value of an established asset above its "book" value and "recognizing" an asset which does not otherwise appear on the books of a going concern. While the latter may not be a mere chimera, it is subject to more analysis.

*First Hawaiian* was recently affirmed by the Ninth Circuit in an unpublished opinion—*First Hawaiian, Inc. v. United States,* Nos. 86–2672, 86–2777 (9th Cir. Nov. 25, 1987) (see table 833 F.2d 1016). The Ninth Circuit noted that the issue was primarily one of the appraisal value of a clearly recognized asset (loans receivable), as opposed to the creation of an asset. As clearly distinguishable as was the seller Hawaii Thrift and Loan's situation from that of BEA (the institution had suffered "a run on its assets"), the Ninth Circuit still stated,

> FHI cross appeals the district court's finding that part of the $2.16 million was paid for goodwill and going concern value. It first contends that the adverse publicity and run on HTL's reserves eliminated all of HTL's goodwill. But the evidence indicates that FHI continued to expect patronage from many of HTL's existing customers. For example, FHI's own evaluation of the assets says "the current customer lists are expected to provide recurring relationships as well as provide prospective customers." Additionally, the government's expert testi-

---

**53.** The Government also argued that the Falcons had the right to share in the NFL's goodwill.

**54.** Arguably, the attempt in *Laird* to amortize "television rights," which was disallowed by the court is more pertinent here.

**55.** For a similar situation, see *Super Food Serv., Inc. v. United States,* 416 F.2d 1236 (7th Cir. 1969) (reversal of summary judgment). In that case, the contracts were valued individually. The court does state: "Any quarrel with the going concern value of contracts acquired as a part of the business is properly directed to the allocation to be made between goodwill and the contracts purchased...." Here, the court has been given no basis for an allocation. Plaintiff relies on there being *no* goodwill. Plaintiff apparently senses that, if there is goodwill, it is inseparable from the deposits. Plaintiff's experts testified as to the value of having depositors in place and the cost savings attendant to not having to attract such depositors, but offered no evidence as to the cost of attracting depositors or the resulting savings.

fied that such adverse publicity does not necessarily extinguish all goodwill.

FHI also contends that HTL had no going concern value because FHI found it necessary to close and move branch offices and to fire employees, and found that HTL's existing business structure was more of a liability than an asset. There is, however, ample evidence to indicate that HTL had considerable going concern value, notwithstanding the need for substantial modifications. HTL had eleven functioning offices, employees, equipment, customers, a name that had been in the ILC business since 1952, and a substantial share of the ILC market. FHI thus acquired a fully operational ILC business that it would begin to operate immediately, after having been repeatedly rebuffed in its previous efforts to get into that market. Accordingly, the district court's determination that some of the $2.16 million was properly allocable to goodwill and going concern value is not clearly erroneous.

The Ninth Circuit recognized that the trial court's allocation of values was somewhat arbitrary, but still approved it. Here, there is no evidence which would allow this court to allocate a portion but not all to goodwill even assuming (the court does not so find) that some part is separate and distinct.

In *Business Service Indus., Inc. v. Commissioner*, 51 (CCH) 539 (1986), there is a discussion of depreciable tangible asset(s) but no real analysis of goodwill factors or continued existence. In *Securities–Intermountain, Inc. v. United States*, 460 F.2d 261 (9th Cir.1972), the seller remained in business and in competition with the taxpayer. Taxpayer merely acquired a single insurance company's mortgage loan portfolio. The court found that no goodwill was transferred.

Plaintiff also relies upon *L.A. Central Animal Hospital v. Commissioner*, 68 T.C. 269 (1977). There the court stated, *inter alia*,

These records are further differentiated from goodwill in that their value to the petitioner is as a body of factual informa-

tion to be used in the treatment of patients. As such, these records are similar to the credit records, which we held to be depreciable in *Computing & Software, Inc.* In both cases, the records are valuable primarily as a resource for serving the clients of the business.

68 T.C. at 274.

The recent case of *Panichi v. United States*, 834 F.2d 300, 302 (2nd Cir.1987) distinguished *Manhattan Co. of Va., Inc. v. Commissioner*, 50 T.C. 78 (1968), cited by plaintiff from other cases, by saying

The Government argues on appeal that, as a matter of law, the value of the customer list is inseparable from goodwill. However, the depreciation cases on which it relies involve purchases of entire businesses as going concerns. *E.g. Thrifticheck Service Corp. v. Commissioner*, 287 F.2d 1 (2d Cir.1961); *Ralph W. Fullerton Co. v. United States*, 550 F.2d 548 (9th Cir.1977). In contrast, where a customer list is acquired as an asset separate from a going concern, it may be depreciated. *See, E.g. Thrifticheck Service Corp. v. Commissioner*, 287 F.2d 1 (2d Cir.1961); *Ralph W. Fullerton Co. v. United States*, 550 F.2d 548 (9th Cir.1977). In contrast, where a customer list is acquired as an asset separate from a going concern, it may be depreciated. *See, e.g., Holden Fuel Oil Co. v. Commissioner*, 479 F.2d 613 (6th Cir.1973); *Manhattan Co. of Virginia, Inc. v. Commissioner, supra*, 50 T.C. at 90–91. In the present case, Dutchess sold only its trash collection operation, while remaining in the business of refuse disposal. More important, Panichi acquired only a small fraction of Dutchess' customer route stops and some equipment; the remainder of Dutchess' route stops were sold to other purchases, and Dutchess retained its trade name for its ongoing business. In *Manhattan Company*, the Tax Court determined that where a laundry company that remained in the cleaning business sold its home pickup and delivery lists and some equipment to several purchasers, the customer lists had ascertainable value and the pur-

chase price for the lists could be allocated between depreciable and non-depreciable portions. 50 T.C. at 90–91. As the District Judge in the pending case recognized, *Manhattan Company* is virtually indistinguishable from the present facts. A similar distinction is applicable here.

The court has not attempted in these findings and conclusions to discuss all of the cases cited by plaintiff and in the American Bankers Association's (Association) *Amicus Curiae* brief.[56] These cases and cases relied upon by the defendant only serve to emphasize the factual nature of the issue.

The court will not exhaustively list or discuss cases which are arguably supportive of defendant's position. They include *Golden State Towel and Linen Service, Ltd. v. United States*, 373 F.2d 938, 944, 179 Ct.Cl. 300 (1967) where the court stated:

> Summing up, a purchased terminable-at-will type of customer list is an indivisible business property with an indefinite, non-depreciable life, indistinguishable from—and the principal element of—goodwill, whose ultimate value lies in the expectancy of continued patronage through public acceptance. It is subject to temporary attrition as well as expansion through departure of some customers, acquisition of others, and increase or decrease in the requirements of individual customers. ·A normal turnover of customers represents merely the ebb and flow of a continuing property status in this species, and does not within ordinary limits give rise to the right to deduct for tax purposes the loss of individual customers.

The court also notes *Nelson Weaver Realty Co. v. Commissioner*, 307 F.2d 897, 901 (5th Cir.1962) where the court stated:

Cobbs–Allen purchased, therefore, not only the right to service approximately 1,830 mortgages, but it received from Mortgage Company all of the records and files which had been compiled over the years in connection with those mortgage loans. *Cf.* Rev.Rul. 55–79, 1955–1, Cu.Bull. 370. It obtained also the list of the approximately 1,600 mortgagors who had been the satisfied customers of Mortgage Company and who were figuratively tied to their agent through whom they had dealt through the years. These were a ready-made market, not only for future loans, but as prospects for the sale of homes, lease of apartments, sale of insurance on homes, automobiles and like items. Upon the completion of the sale Mortgage Company severed all connections with this large aggregation of mortgagors and turned over this valuable relationship, with all of its records, to Cobbs–Allen.

It cannot be doubted that the sum total of the ingredients of this longstanding relationship with such a satisfied clientele constitutes a property right which is the equivalent of good will—the probability that the old customers will resort to the old place.

*See also Blaine v. United States*, 441 F.2d 917, 919 (5th Cir.) *cert. denied*, 404 U.S. 952, 92 S.Ct. 286, 30 L.Ed.2d 269 (1971) where the court stated:

> The governing rule was recently expressed in *Salome v. United States* where it was said:
>
>> To qualify intangible property for amortization, taxpayers had the burden of establishing that it was of use in the business for only a limited time and that the length of this period was estimable with reasonable accuracy.

---

**56.** In its brief, the American Banking Association makes several *ipse dixit* statements. The court does not agree that there was no goodwill because of "the spectacular and widely publicized indictment and imprisonment of the bank's president." To the contrary, the 100 year old bank did not suddenly lose its reputation because of bad loans made by the president. If that were so, many existing banks would lose their "reputations." Almost unbelievably the Association argues, "In contrast, as long as a customer has a belief that the deposits within the bank are secure, the depositor is not influenced by the attributes of the bank, *i.e.* name *and reputation.*" (Emphasis added). This will come as a stark revelation to those customers who have been led to believe that they "have a friend at _____ National." The likelihood of such apathy, if it exists at all, is much less in a small community such as Opelika.

Treas.Reg. § 1.167(a)–3 (1956). If they had developed evidence, their task would have been to distinguish the so-called renewals they purchased from the insurance dailies, subscription lists, and expirations involved in *Commissioner of Internal Revenue v. Killian,* 5th Cir.1963, 314 F.2d 852. There the Court held that the dailies, subscription lists, and expirations common to a fire, casualty, and automobile agency are in the nature of goodwill, have an indeterminate life span, and therefore are not subject to a deduction for depreciation. 395 F.2d 990 (5 Cir.1968). *See also Sunset Fuel Co. v. United States,* 519 F.2d 781 (9th Cir.1975) where the Court stated:

> In acquiring the customer list of a going business, the purchaser obtains a new level of operation in a market already opened by the seller, which will ordinarily be maintained in the normal operation of the expanded business at least partly through customer referrals, the return of customers who discontinue their orders and later resume doing business, and like elements of goodwill inherent in the customer structure.3 When an account is lost, a ratable portion of the mass' goodwill, beyond the expected flow of income from that particular acount, is not necessarily lost with it, as the lost customer may refer other customers to the business, and may later resume his orders. Thus, the "indivisible asset rule" prevents a deduction from being taken on goodwill which inheres in customer structure as such and which is not lost when particular accounts are lost.
>
> 3. Aside from the effects of such component elements of good will, the efforts of the buyer in soliciting business and the like may be necessary to maintain the expanded level of operations acquired in the purchase. Such expenses are deductible as ordinary expenses against current income, how-

ever; and thus, viewing the structure initially purchased as the same capital asset which is later sold does not prejudice taxpayer, avoids the difficulty of determining which portion of current expenses must be capitalized, and prevents the improper transformation of ordinary income into capital gains.

519 F.2d at 783 n. 3 and accompanying text.[57] *See also Winn Dixie, supra.*

The defendant has cited a number of other cases, other than some of those also relied upon by the plaintiff, which may support its position. The court has read, *inter alia,* but will not discuss, *NCNB Corp. v. United States,* 684 F.2d 285 (4th Cir.1982); *Ralph W. Fullerton v. United States,* 550 F. 2d 548 (9th Cir.1977); *Colorado Springs National Bank v. United States,* 505 F.2d 1185 (10th Cir.1974); *Skilken v. Commissioner,* 420 F.2d 266 (6th Cir.1969); *Barran v. Commissioner,* 334 F.2d 58 (5th Cir.1964); *Boe v. Commissioner,* 307 F.2d 339 (9th Cir.1962); *Thrifticheck Service Corp. v. Commissioner,* 287 F.2d 1 (2nd Cir.1961).[58]

The court will not continue with these citations which, again, may merely reflect the basic factual nature of the inquiry.

### *Ultimate Finding and Conclusion*

■ The court ultimately finds and concludes that BEA had goodwill and that plaintiff has not met its burden of proving that the customer deposit base had a value which was separate and distinct from the goodwill of BEA. As stated in the Association's brief, "a deposit relationship becomes a point of contact with customers for selling the bank's income-producing services." (Page 4). The Association further argues that the deposits are "an avenue for selling the bank's income producing services (i.e. safe deposit rentals, safe-keeping services, discount brokerage services, trust services, installment loans, and the myriad of services for commercial customers.)" (Page 8).

57. To the extent that expenses have been or will be incurred by plaintiff, after the purchase, to maintain old or create new deposit relationships, the expenses will, presumably, be deductible.

58. Some of the cases cited by the parties consider 26 U.S.C. § 162. They are arguably analogous.

The court agrees and further concludes that this tends to make the deposit relationship inseparable from goodwill when it exists.

In *Midlantic, supra,* the court noted that "deposit relationships and particularly demand deposit relationships tend to be the focal point for other bank customer relationships." Tax Ct.Mem. Dec. (PH) p 83, 581, at 83–2371. Defendant's experts have argued the same in arriving at their opinions. Plaintiff's experts have tended to downplay this fact.

At the possible risk of being too simplistic, the court would make the following observation.[59] When deposits are made, two accounting entries result. First, there is a debit (asset) entry for cash or its equivalent. Second, there is an equal and offsetting credit (liability) entry for the liability to the depositor. Any additional asset must be different from the cash thereby acquired. Its creation must, somehow, result from the expectation that the depositor will allow the cash, or its equivalent, to *remain* as an asset and that earnings will result therefrom. This expectation is akin to, if not tantamount, to the expectancy that "old customers will resort to the old place" of business or continued "customer patronage." The "additional" asset does not just materialize out of nowhere. It is geared to the expectancy of the *continued* deposit relationship (patronage).[60]

The relationship between accounting for goodwill and other intangibles for tax purposes and for regulatory purposes should be kept in proper perspective. Tax law does not preclude the carrying of either goodwill or a core deposit base as an asset. It does limit the circumstances under which the asset's value may be amortized and deducted, if at all. On the other hand, the regulatory authorities are concerned that a bank's assets not be overstated, and while they allow goodwill and core deposit base to be initially carried as an asset, they

*require* that the assets be amortized and written off over time. The regulatory authorities have, in effect, provided a compromise between not allowing intangible assets to be reflected on the bank's books at all and allowing them to be charged off gradually.

The very definition of "core deposits" would appear to tie them to goodwill. Core deposits *do not* include those deposits which are more sensitive to interest rates and other market and economic influences, such as high amount C.D.'s or governmental accounts, etc. The "core deposits," being less sensitive to market forces, are likely to be even more sensitive to goodwill than are "non-core deposits."

For accounting purposes, a bank may be able to "identify" a customer deposit base even though it may not be separate and distinct from goodwill. To the extent that deposits remain after some contractually stipulated period, they result from, "continued patronage." The mere fact that the deposits themselves are identifiable, does not make their *"value"* separate and distinct from goodwill. Other facets of bank activities such as safe deposit "expectations," loan "expectations," etc. could perhaps be similarly "identified" so as to phase out the concept of goodwill. There is no indication that tax law permits or contemplates this result.

Plaintiff makes too much of its suggestion that the "mass asset" rule has been supposedly repudiated. What has not been eliminated is the necessity to inquire into the issue of "separate and distinct." There seems to have been no clear cut repudiation of the "mass asset" doctrine as a factual consideration; only a recognition that it is not the alpha and omega of the inquiry or a *per se* legal issue. In any event, the court has not relied upon any such "rule." All factual inquiries must come to an end. The court will enter judgment for defendant.[61]

---

**59.** The court does not specifically rely upon this analysis for its ultimate conclusion. The court primarily relies on the general principles quoted above.

**60.** *Cf. Solitron Devices, Inc.,* 80 T.C. 1 (1983); particularly at 21–24.

**61.** There are other issues which the court has not found it necessary to address, but which may be relevant, if the court's underlying prem-

## ORDER

In accordance with the Findings of Fact and Conclusions of Law filed contemporaneously herewith, judgment is entered in favor of defendant and against the plaintiff. This action is DISMISSED, with prejudice. Costs are assessed against the plaintiff.

## ADDENDUM

## SUMMARIES OF EXPERTS' REPORTS AND OPINIONS

### SUMMARY

### EDWARD J. KANE [1]

#### (Defendant's Expert)

A. The term "intangible core deposits" is an accounting term used to assign the residual elements of a bank's purchase price to a single specific source. It is the portion of the negotiated sales price that cannot be expressed in terms of identifiable assets and nonequity liabilities. The term, "intangible core deposits" springs from questionable and unproven claims about the nature of the purchase premium.

B. A purchaser of a bank buys the future income flow from the bank's activities. A bank produces income by (1) acting as a financial intermediary. This means that the bank finances its loans largely from liabilities which it creates. A bank's charter permits it to do this.

The lending and borrowing activities of a bank are complementary; neither one logically comes before the other. It would be unreasonable for a bank to engage in only borrowing or only lending, and not both at the same time. A bank that only took deposits would not be able to offer sufficient interest or customer services to keep its customer deposits.

The other means by which a bank earns income is by performing a range of financial services for its customers—either for a fee or as a form of implicit interest paid to its depositors.

Because the intermediary and financial services aspects of a bank's activities are so closely intertwined, banks generally don't account for them separately. Consequently, it is almost impossible to separate the cost of maintaining customer deposits from the cost of maintaining the customer base of all of the bank's activities.

C. Accountants document sources of value from explicit and observable market transactions. This is an estimation technique based on historical transactions which gives rise to the "book value." In contrast, a financial economist looks at the bank's value (stock value) as the sum of the capitalized values of all of the bank's activities. This approach focuses on projected values. These estimates are often mentioned in the form of footnotes to GAAP reports (GAAP do not allow such abstract and hard to observe values to be booked individually on a balance sheet).

There are three components to the unbookable sources of a bank's value.

I. Unrealized capital gains on readily tradable positions in financial contracts. (Purchase accounting assigns a value to these at the time of acquisition).

II. The going concern value of the bank's charter or franchise which will allow it to perform financial intermediary services.

III. The value of the various federal guarantees and commitments that the bank enjoys (i.e. the federal discount window and FDIC insurance).

---

ise is rejected. These include the date of the deposit totals used as a basis for measurement, the failure to review the calculations, and the failure to properly proportion when the "premium" paid was less than total values. Further, it has not been necessary for the court to specifically address the issue of whether the customer deposit base has an ascertainable value which has a limited useful life, the duration of which can be determined with reasonable accuracy. Just as "anything can be proved with statistics,"

any values and the life thereof may arguably be proved by accountants and economists. Here, it is difficult to determine if the efforts of *Ernst* and *Golembe* successfully satisfy the element. In any event, the value determined was not separate and distinct from goodwill.

1. Professor, Banking and Monetary Economics, Ohio State University.

When added to the book value, I produces the bank's liquidation value which is the lower bound of the bank's value. II represents the bank's value as a going concern. The bank's assets and liabilities generally gain additional value from being folded into the operations of a going banking concern because a loan often generates additional business for the holder and additional services for the borrower.

D. III represents the value of the bank's access to federal credit enhancements. The value of FDIC insurance and access to the Federal Discount window can best be expressed in terms of the difference in the interest that the bank would have to pay on deposits in the absence of such federal credit enhancements and the rate that it pays on such deposits because they do exist, i.e. the difference in interest cost between an unguaranteed loan and a loan guaranteed by someone with limitless resources.

E. What AmSouth lables as intangible core deposits can best be understood as a federal credit enhancement. It does not reside in the particular deposits at BEA at the time of acquisition, nor does it have a limited life. It attaches to deposits of old and new BEA customers alike. They can be viewed as giving BEA's acquirer an indefinite franchise to raise and invest federally insured deposits in the bank's market area.

F. Apart from the value of this credit enhancement, the potential business generated by the bank's customer base may be an additional source of value to the acquirer. However, it is unrealistic to treat this customer base as having an ascertainably limited life and to allocate it solely to the deposit side of the bank's operations. A bank's ability to utilize the additional business generated by the customer base will vitally depend upon;

—its future service performance,

—its rates on loans and deposits relative to its competitors,

—the economic circumstances of the bank and its customers, and

—general competition from other firms and other financial institutions.

Thus, value flows from both the deposit side and the services side of the bank's activities.

G. AmSouth's actions with respect to the BEA customer base are inconsistent with the customer base having the status of a depreciable asset. If this were so, then AmSouth should capitalize expenses incurred to enhance the customer base, such as promotion, etc. Instead, Amsouth deducts promotion expenses in full as a current expense.

## CRITIQUE OF THE *ERNST & ERNST* (E & E) AND *GOLEMBE REPORTS*

a. (1) What E & E calls the future benefit of the customer base is just the value of the Federal credit enhancement because it allows the acquirer to get funds "... at rates below the current money market rates." It is the difference between the rate the bank would have to pay if there were no federal insurance and the rate it pays on insured deposits.

a. (2) E & E also calculates a finite life for the value of the credit enhancement—assuming that it will pass away as the individual customers leave the bank. This assumes that BEA is a liquidating entity. However, by all indications, AmSouth has continued and will continue to operate BEA as a going concern. A liquidating firm perspective is simply unrealistic.

b. (1) The Golembe report also adopts similar misconceptions, calling customer deposits, "the most favorable source of funding for commercial banking" without taking note of the value of the federal credit enhancements. Moreover, the report suggests that customers of banks don't discern significant differences among services and pricing between banks. If, however, this were true, it would not be reasonable for a bank to make the significant investment in building the relationship that they all do.

b. (2) In addition, the Golembe report makes a misleading claim when it says "the purchase of deposit relationships has the same fundamental character as the pur-

chase of a collection or delivery service with an established base of existing customers." This statement fails to recognize that government regulation and FDIC insurance limit entry of other firms and confer on the bank an additional source of value.

The value of these federal credit enhancements is not fixed but it does not necessarily decline over time. Rather, it fluctuates along with changes in the riskiness of the institution and the general financial environment.

## IN GENERAL

a. Deposit insurance guarantees also have limited conveyability. Typically, when a bank is sold, deposits (negative value) are transferred along with assets. In most cases, the assets are more valuable. In addition, the guarantees lose value when they are transferred from the FDIC (a government agency) to some private entity with shallower pockets.

b. The reason that regulatory accounting principles and GAAP confer some recognition on the concept of core deposits is to try to reduce to more concrete terms the large premium paid in arms length transactions for the purchase of a bank which is often labled "goodwill." From the regulator's point of view, the use of the term "core deposit intangibles" has the advantage of distracting attention away from the role that regulatory authority plays in creating this value. The truth is that such guarantees are a form of equity contributed by the taxpayer, not the stockholder.

c. The value of the bank's customer deposit base is not separate and distinct from goodwill or going concern value. The business opportunities arising from these deposits cut across many dimensions of the bank's service function and benefit from the cost economies of producing bank services jointly. Such economies can only be realized in the context of a going concern. The recent technological changes in the banking industry (computerized record keeping, teller functions and improved tele-communications) have increased the role of multipurpose capital equipment in producing financial services.

## SUMMARY

### DONALD J. PUGLISI [1]

(Defendant's Expert)

A. The value given to an asset by an investor is a function of three characteristics;
—the size of the benefits to be received
—the timing of the receipt of those benefits
—the risk of nonreceipt of those benefits

Present value analysis is used to determine the value of an anticipated future stream of after tax cash flows. First, the investor specifies the expected benefit in each future time period over the asset's life. Second, the investor determines the riskiness of the cash flow. The discount rate incorporates risks related to the receipt of the benefit and also reflects a variety of factors including

—compensation for deferred consumption and inflation
—business risk (variability in return related to the nature of the firm's business)
—financial risk (variability in return due to the way the firm finances its operations)
—interest rate risk (variability in the price of an asset as interest rates change)

In present value analysis, less weight is given to cash flows to be received further in the future than to those received in the near term. Present value analysis does not necessarily produce an estimate of value that will be subject to depreciation over time under the federal tax laws.

B. There is no universally accepted definition of core deposits—there are a wide variety of views. AmSouth itself uses the term, "intangible assets inherent in an assembled body of customer deposits". However it excludes CDs of value over 100K

---

1. Professor of Finance, University of Delaware.

because they might not be associated with core customers.

The E & E and Golembe reports also use differing definitions of core deposits. The most widely accepted definition of core deposits encompasses liabilities that are (i) stable over time, (ii) relatively low cost and (iii) do not have interest rates that are quickly responsive to changes in market interest rates.

C. Core deposits have the following attractive features from the banks point of view. They are low cost, stable, carry with them potential customer relationships and are relatively insensitive to interest rate pressures.

Generally, banks recognize that in purchasing core deposits, an acquirer receives more than a source of funds *per se*. In fact, the bank purchases a series of complex financial relationships that encourages it to pay a premium over the book value. This has been recognized in the case of BEA by several AmSouth statements and documents (author cites examples starting on p. 12 of Dx–42).

The value of such core deposit intangibles (CDI) is generally considered to be the present value of the future income stream associated with the bank's core deposits. However, from a practical perspective, it is impossible to break down the net income from the acquired bank as a whole into income from the various components of the acquired bank.

D. Based on surveys, it appears that consumers select their financial institutions primarily on the basis of convenience, service and reputation. These attributes of a particular bank are commonly known as "goodwill". In addition, perhaps the bank's most valuable asset is its charter because it allows the bank to take deposits and to make commercial loans. FDIC insurance, when added to the bank's charter, form its foundation. These are perpetuities.

Thus, efforts to measure the value of CDI are actually efforts to measure the value of those attributes of the bank that facilitate the gathering of core deposits and the total relationship with those who establish core deposit type accounts with the bank. Consumers select banks for a variety of reasons; key among them deposit insurance and characteristics of a bank that can be generally termed goodwill.

E. To meet the criteria for a depreciable asset under the tax code, an asset must (i) have an ascertainable value distinct from goodwill (ii) have a limited useful life and (iii) the length of the asset's life must be determinable with accuracy.

(i) The FASB takes the view that CDI may have an ascertainable value. FASB 72 allows for the assignment of value to intangible assets that can be separately identified when the values of the assets can be reliably determined, are verifiable and are representationally faithful. If these conditions are not met, the intangible will be valued under the general category of goodwill.

The value of CDI is sometimes estimated by determining the present value of the net interest margin between the interest paid by the bank on deposits and the yield on loans made by the bank. The FASB has rejected this "net spread" approach. The "net spread" approach, however, represents the reality of how a financial institution is valued. It is a portfolio of assets, rather than an individual summing of assets and liabilities. Moreover, the FASB view fails to account for possible growth in CDIs as a reflection of the ongoing nature of a bank's business. Many researchers and other writers have addressed the CDI issue and have recognized the complexity of the customer bank relationship and the impossibility of valuing CDI distinct from goodwill. (author cites examples pps. 23–26 of Dx. 42).

F. In practice, it is impossible to assign an value to CDI because there is no agreement as to (i) what CDIs are (ii) how CDI benefits are to be measured (iii) the derivation of the present value of these benefits.

The two firms retained by AmSouth to measure the benefits from the acquired BEA deposit base use different means of measuring its benefits. Golembe follows the view that the benefit is the net interest

derived from the banks investment of deposit funds. In contrast, E & E measures the benefit in terms of the interest cost savings from the acquisition of funds at lower than normal rates. In addition the two firms use different discount rates to determine the PV of the CDI benefit and both of these rates are well below the rates used by most other studies.

G. The CDI is predicated on characteristics of the bank that have unlimited life. Imbedded in the value of the CDI is the value of the bank's FDIC insurance and charter. FASB 32 ignores these factors as giving rise to the bank's ability to get CDI money at below market rates. Moreover, this view also assumes that the pool of CDI at a bank will erode over time. In reality, there is no reason to assume that this will occur.

H. Assuming arguendo that the CDI had a limited useful life, its length would be impossible to predict with any degree of accuracy. To determine useful life, one would have to separate those deposit relationships that are acquired from those that are developed by the sucessor bank. However, those two sets of deposits are highly interdependent and largely inseparable.

### CRITIQUE OF AMSOUTH VALUES

—AmSouth adopted the E & E report even though AmSouth assigns a premium of 1.679 million to the deposit base while E & E assumes a value of 3.1 million.

—AmSouth assumes that the CDI has value without taking account of the bank charter and federal insurance.

—AmSouth assumes no going concern value for BEA even though its own statements regarding the purchase suggest to the contrary.

a. The E & E Study

—values CDI not on the net interest basis but on the cost of funds basis—ignores FDIC and charter value.

—defines the customer deposit base as all of BEA's deposits, failing to recognize that some deposits are not stable and that

reserve requirements lower the availability of funds for investment.

—estimating the useful life of the CDI is at best an inexact art.

—the costs of available alternative funds are poorly specified in the study.

b. The Golembe Study

—the study excluded .9 million in large denomination CD's from the CDI but included 1.2 million in large CD's to regular customers. This is a broader view of the CDI that is generally held since CD's are repriced to market with a large degree of frequency.

—Golembe makes several statements indicating that CDI are akin to goodwill/going concern value

—Golembe refuses to take account of the bank charter and FDIC insurance as a source of value for the CDI

—Golembe recognizes that there is no accurate way to measure the value of the CDI.

### SUMMARY

### PERKINS, SMITH INCORPORATED [1]

#### (Defendant's Expert)

A. There are two approaches to valuing an asset. The first is the comparable sale approach which involves finding a transaction in which an asset identical or very similar to the one being valued changed hands and appllying the values in that sale to the asset being valued. The other method is the investment value method which involves determining the rate of return that an investor would require to make such an investment. Then the investor determines the price which he would pay for the asset in order to achieve the desired rate of return.

B. A bank is a financial intermediary. It collects funds from savers (paying them interest as rent) and loans the funds to borrowers. Banks make their profit on the spread between the rate at which they obtain funds (the rate paid to depositors) and

1. Financial consultant's testimony presented by      Marc Perkins, Chairman.

the interest rate which they receive from their borrowers. Banks exist because savers and borrowers cannot find each other conveniently.

C. In order for AmSouth's position, that the value of a bank's deposit base may be determined by discounting future profits to be earned from that profit base to be true, it must be assumed that taking deposits is a "stand alone" business of the bank; i.e. deposits are attracted to the bank solely because of its deposit taking capability and that the bank's function as a lender has no effect. Moreover, since 100% of the premium on the sale is being assigned to the deposit base in this case, it must also be determined that no item in the transaction, other than the deposit base had any intangible value whatsoever. There are several other items in the transaction which have potential market value including the bank's charter, deposit insurance, market entry and goodwill. For AmSouth's contention to be valid, one would have to assume that if, on the day after it was purchased, BEA announced that its sole function would be the taking of deposits, the deposit customer relationships would not be affected. This is not a valid assumption.

D. The deposit base has no "stand alone" value and as such does not represent an asset that can be carried at value and depreciated.

(1) Value: it is impossible to have a deposit base independent of the customer relationship, the market franchise, goodwill, etc.

In addition, there are no comparable sales by which to value the deposit base. Moreover, the value of the deposit base is being recorded by AmSouth at about ½ of its appraised value. This is illogical because assets don't normally sell for ½ their true value. This implies (i) great inaccuracy in the appraisal process; and (ii) that there is no intangible value to be assigned to the lending side or to the bank's goodwill or market presence. If this were true, why would anyone make loans?

E. Banks can collect deposits at below market rates because they have deposit insurance. This is a perpetual, nonwasting asset. Moreover, the deposit base itself is best thought of as a self-renewing, rather than a wasting asset. All things being equal, a certain number of depositors will come and go over time.

F. Even if a deposit base were determined to have a value, the amount of the value would not be determinable with any degree of accuracy. The rates paid on deposits and the creation of new instruments can be greatly affected by changes in market interest rates and by regulation.

Moreover, the collection of deposits is intertwined with other bank functions. For example, banks extending credit to customers often require that such customers maintain compensating balances at the bank. Most banking relationships are, in fact, more closely tied to extensions of credit rather than the taking of deposits. If a bank were unable to extend credit, it would lose the bulk of its commercial depositors.

## SUMMARY
### REPORT OF ERNST & ERNST [1]
#### (Plaintiff's Expert)

Ernst and Ernst in their memorandum reported how they evaluated the bank's customer deposit base's estimated value and life. First, the accounting firm cited various accounting principles applicable to this transaction. Accounting Principles Opinion No. 16, for instance, mandated that historical-cost accounting would be used to record acquisition of assets and liabilities. But in a case where the assets are acquired by cash, the total assets equal the amount of cash disbursed. This Opinion also states that acquiring assets in groups requires not only ascertaining the cost of the assets as a group but also allocating it to the individual assets which comprise the group. Intangible assets should be recorded at appraised values. In Accounting Principles Board Opinion No. 17, which provides for accounting for intangibles, the Board con-

1. Certified Public Accountants.

cluded that intangible assets acquired from other entities should be recorded at the date of acquisition. The cost allocated to each should normally be based on the fair value of the assets.

The value of customer deposit base in question was considered in the light of several factors. First, plaintiff acquired the demand and time deposits at below the money market rate in 1978–79. A portion of the purchase price can, therefore, be attributed to the value the company placed on the future benefit of this "asset." Because the rate was below market, these current banking relationships entitled the company to future earnings on customer deposits.

In calculating the future benefit of the customer deposit base, Ernst and Ernst developed the following equation, "the present value (based on [plaintiff's] incremental borrowing rate of the differential in the current incremental borrowing rate of [plaintiff] and the alternative funds rate based on the bank's total cost of funds and the cost of [plaintiff's] equity investment in the bank) multiplied by the projected average balances of the customer deposit base over the estimated useful life of such base."

The incremental borrowing rate was calculated by considering the company's sources of available financing. These included short term debt, commercial paper, intermediate term debt, and long term debt offerings. The accounting firm also considered the company's use of financing, its past borrowing activities, and the fact that 1979 was marked with rising interest rates. From these sources, the accounting firm concluded that the company's incremental borrowing rate to be 9%.

Next, they computed an "alternative funds rate." First, the cost of the alternative funds rate was established by deter-

mining the sum of the average costs of funds for the three years ending December 31, 1978 [2] and the cost of equity investment in the Bank of East Alabama at a rate of 9.0%. This yielded a sum of $3,093,933. Next, the average deposit balance for the same three years ending December 31, 1977 was added to Alabama Bancorporation equity investment. This resulted in a total of $39,714,000. The actual alternative funds rate was then calculated as the percentage of costs to this total. This yielded an alternative funds rate of 7.8%.

Next, the difference between the company's incremental borrowing rate (9.0%) and the company's alternative funds rate (7.8) was determined. The difference in the cost of funds rate was thus determined to be 1.2%.

The second aspect of the report deals with the estimated life of the acquired deposit rate. This was estimated by using mortality tables and other sources of population shift data compiled by the Census Bureau. The report also evaluated the Bank's own history of closed accounts.[3]

The latter source of data was compiled over a three month period by bank personnel. Only demand deposits were reviewed during this period because they were considered the pivotal relationships with the bank. Closed individual and business accounts were found to be 1.38% and .57% respectively of the average test period balances of such accounts. These figures convert to annual closing rates of 5.52% and 2.2% for individual and business accounts respectively.

Also considered was the impact of customers' life expectancy and the impact of customers relocating to other areas in the deposit base's life; since this has a direct impact on the future behavior of the bank's customers. The mortality rate [4] was deter-

2. The average cost of funds was determined by adding interest on deposits with the cost of servicing the accounts less service charges on the accounts. The cost of servicing included salaries and employee benefits, net occupancy expense, furniture and equipment expense, and provisions for loan losses.

3. Account closing are valid indicators of the future deposit base because they include all possible reasons for terminations and represent the past experience of the bank's customer base.

4. Mathematical probability that a person of a given age will die within one year.

mined by applying the 1958 Commissioner's Standard Ordinary (CSO), used in the insurance industry to determine mortality. Relocation impact, on the other hand, was determined by making reference to the latest migration tables available from the U.S. Bureau of Census for Lee County and to Alabama County Data Information provided by the Alabama Development Office, Montgomery, Alabama. The mortality rates indicated a maximum life expectancy of 40, while the relocation data revealed a maximum life of 25 years for persons residing in Lee County. This divergence could be explained by the differences in individual and business past closings. As a result, the accounting firm recommended a life of 25 years for the individual deposit base, and a life of 40 for the business account deposit base.

Then came the actual computations of using the various figures heretofore mentioned. The alternative funds rate (7.8%) was multiplied by the projected average balances of the individual and business deposit accounts over their assumed life. They then computed the present value of each year's differential borrowing rate which indicated that the deposit base had a value of $3,100.000.[5]

## SUMMARY
### GOLEMBE ASSOCIATES, INC.[1]
#### (Plaintiff's Expert)

In purchasing the Bank of East Alabama, Opelika, the Lee County Bank paid a substantial premium to the shareholders. In the purchase of failed banks, it is not unusual to pay such a premium. In this case, however, the bank has not failed, but has undergone severe difficulties. This purchase of accounts nonetheless represents an intangible asset that has a value in the market place. Thus, our purpose is to determine its value.

There are at least two situations when the deposit liabilities have value. One of

these is in bank mergers and acquisitions where premiums are paid over and above the equity being acquired. Another case is where banks credit the net income contribution of their trust departments with the estimated net income obtained from the deposit balances of their trust accounts.

Premiums paid over book value in acquiring an enterprise represent the value of some resource that the purchaser cannot otherwise obtain at any lower price. As a general rule, no item on the asset side of a commercial bank's balance sheet explains the practice of premiums being paid above book values of capital in bank acquisitions. Since the assets consist predominantly of cash, marketable securities, and loans—all of which are readily available in the marketplace—these assets offer little incentive for the purchaser to pay a premium.

*Liabilities* in the form of deposits, on the other hand, offer the bank a unique opportunity to grow. A bank's success ultimately depends on its ability to attract deposits, thus increasing profits and growth. This relationship between the bank and its customers is in large part a matter of convenience and once established tends to continue over long periods. The cost of retaining this relationship, however, may be high and the bank may have to provide services under cost to compete. Thus, deposits represent long-term commitments which come with a price.

Normally, attrition to the deposit base can be attributed to two causes. The customer may terminate the relationship because of (1) changes in personal circumstances; (2) insufficient need for a relationship with any bank, and (3) the inducement of a competing bank. The decision to terminate can occur at any time, weeks or even months before the account is actually closed. Thus, it is often difficult to determine exactly when its relationship with the bank has ended.

---

5. This was recorded for accounting purposes as only $2,041,000. which represents the difference in the purchase price and the values allocated to the other assets acquired net of deposits and other liabilities assumed. Thus, it was recorded as "value assigned to deposit base."

1. Financial consultants. Testimony presented by Dr. Morgan.

From the previous analysis, it is obvious that the bank may expect the deposits to remain in the short run. In the long run, however, the deposit pool wastes over time. Since it is costly to retain these accounts, the value of the deposit relationships to an acquiring bank is derived from a future net income stream that has been created from past investments in developing those relationships.

The approach for evaluating deposits stresses the net income stream itself because it is this stream rather than the deposits themselves which has value. Here, the advocated method of evaluation focuses on the present value of the stream which is actually being brought in by the acquired deposits of the bank. In this hypothetical model, it is assumed the bank does not establish new accounts; the acquired relationships simply erode. It is also assumed that the functional costs of operating, as well as its capital requirements, are low. Eventually, these deposits would disappear altogether due to the attrition previously discussed. These deposits would continue to generate revenues from service charges and from returns in invested funds, and this would be offset by expenses in administering these deposits. The value of these deposit liabilities is then the discounted/present value of the net income stream over future time, the net income being the difference between the foregoing revenues and expenses.

Next, the expected useful life of the bank's deposit base was evaluated. Two approaches were used in this evaluation process. One emphasized the bank's experience with account closings over a designated sample period. Demand deposit accounts represent the best indicator of the existence of a banking relationship, since time accounts remain with the bank for some time after the relationship is terminated. Because banks do not have the records necessary to isolate a deposit base at a particular time, it is thus necessary to examine closings over a relatively brief sample period.

From data gleaned from July to September 1978, the annual rate of attrition for demand accounts was found to be 5.52 percent for personal deposit balances and 2.28 percent for business deposit balances. These figures, however, do not reflect the base at some more distant future time. Because of various factors which affect the base, this yearly percentage will understate substantially the longer term rate. Thus, this first approach would be illogical when applied to the long run.

The second approach focuses on the two predominant factors in the attrition process —moving away from the community served by a bank (out-migration) and mortality. While the advantage of this method is that it takes into account the increasing significance of mortality, the main disadvantage of it lies in the fact that business mortality rates and out-migration could not adequately be accounted for. Also, the factors apply to much broader population than the bank's own customers and other reasons for severing the banking relationship are excluded.

In evaluating mortality, it is important that the age distribution be known. Then conventional mortality tables can be applied. For the purposes of this evaluation, however, transient university students were not considered for either the mortality or the annual out-migration rates. This out-migration rate was estimated to be 3.6 percent of the bank's customers in Lee County. The mortality and out-migration rates were then combined, and projected over a 40 year period. This resulted in a prediction that less than four percent of the existing individual customers could be expected to remain at the end of 40 years. Thus, it can be concluded that the deposit base has a useful life of 40 years.

Next, the valuation of the stream of net income generated by these deposits was evaluated. This analysis focuses on four parameters: (1) the purchased deposit base (D); (2) the net rate of return on deposits (R); (3) the annual rate of attrition (L); and (4) the calculation of present value (V).

The purchased deposit base (D) was determined in the following manner: At the end of October 1978, the bank's total deposits were $35.1 million. Of this amount, $.9

**730**

million in large certificates was considered "bid money" and did not represent ongoing customer relationships. Thus, this base is estimated at $34.2 million.

The net rate of return was determined by a number of factors: (1) the deposit mix, such as between demand deposits and time and savings deposits; (2) service charge income derived from the demand deposit accounts; (3) interest expenses associated with the time and savings deposits; (4) costs of processing each type of deposit, including overhead costs associated with this function; (5) the extent to which deposit funds can be invested in earning assets as opposed to being held as cash reserves; and (6) the interest yields earned on the invested deposit funds. The deposit mix, service charge income as a percentage of demand deposits, and interest expenses as a percentage of time, and savings deposits were determined from the bank's records from June 30 to September 30, 1978. The operating expenses associated with servicing the deposit accounts as percentages of account balances were determined from a 1977 Federal Reserve survey. Next, a hypothetical portfolio of securities in which the bank might invest its available funds was also evaluated. The yields calculated were average ones covering the periods from 1974 through 1977, and were significantly below the yields prevailing at the end of that period. Using all of these factors, the net rate of return on all deposits was estimated to be 1.2% which might be an understatement as a result of the unusual market conditions which prevailed in the late 70s'.

The annual rate of attrition (L) was then calculated. One assumption made was that the net income margin on deposits would remain constant over the useful life of this asset, thus, the income flows would diminish at the same rate as the deposit base itself. The attrition rate (L) is also assumed to be a constant percentage reduction in the deposit base each year, because it closely approximates out-migration patterns at least as well as any other method and because its accuracy diminishes substantially only in later years of the deposit base and thus its effects on the present

value of the discounted base tends to be significant. If the original deposit base declines at a constant annual percentage rate so as to reach this amount at the end of forty years, the annual rate would be 7.2 percent. The rate of discount (i) was then evaluated. The appropriate rate of discount is essentially a subjective business decision made by an investor, and cannot be estimated empirically. Thus, a discount rate (i) of 10 percent was employed.

Using all of the foregoing data, the present value (V) was then determined by using the following equation:

$$V = R\,D\,\frac{[L + i]}{[i + L]}$$

Based on these calculations with a 40 year useful life, the present value of the net income stream generated by the purchased deposit relationships is therefore quite likely to be more than $2.61 million. Considering all the factors, the probable present value of the asset acquired by Alabama Bancorporation in purchasing the bank's deposit relationship is approximately $3 million.